RUSHMORE v. SAXON.

(Circuit Court, S. D. New York. January 4, 1908.)

1. TRADE-MARKS AND TRADE-NAMES—UNFAIR COMPETITION—FRAUDULENT IMITATION IN FORM OF ARTICLE.

Complainant was a manufacturer of search light lamps for automobiles, known generally by his name as the "Rushmore" lamps. He also designed a new and distinctive ornamental shell to distinguish his lamps from those of other makers, such peculiar design being nonfunctional. Defendant, who was also a maker of lamps, copied complainant's shell in all particulars even to defects, although, as shown, the shape of such shell rendered his own lamps less effective for use, the result being that in appearance there was nothing to distinguish his lamps from those of complainant except the reading matter on a small and inconspicuous name

plate which was also needlessly put in the same place on the shell as that of complainant. Defendant also sold and billed his lamps to purchasers as "Rushmore" lamps. His lamps were however of lighter and inferior material and cheaper construction and could be and were sold at a smaller price than complainants. *Held,* that he was chargeable with unfair competition, and that complainant was entitled to an injunction to restrain the same; the imitation being clearly by design, and for the purpose of misleading purchasers to complainant's injury and defendant's advantage.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 46, Trade-Marks and Trade-Names, § 81.

Unfair competition, see notes to Scheuer v. Muller, 20 C. C. A. 165; Lare v. Harper & Bros., 30 C. C. A. 376.]

2. SAME—TRADE-NAME—ARBITRARY COMBINATION OF WORDS.

When one has designedly and arbitrarily taken an unusual and ungrammatical combination of two words, even if they do suggest an idea, and a correct one, of the construction or utility of the article, as his designating and distinctive name for his article of manufacture, and by long use it has come to be so understood by the purchasers and users thereof, a competitor has no right to use it for the purposes of deceit.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 46, Trade-Marks and Trade-Names, § 84.]

3. SAME—INFRINGEMENT—DECEPTION OF PUBLIC.

Where complainant arbitrarily selected the name "Flare Front," and used it to designate and distinguish an automobile lamp made by him from all others for so long a time that it became associated by purchasers with his lamps, defendant had no right to appropriate and use such name to aid him in palming off on purchasers as complainant's lamps of his own make which were in appearance exact duplicates of complainant's lamps, and such use by him will be enjoined.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 46, Trade-Marks and Trade-Names, § 84.]

In Equity. Suit to restrain unfair competition in trade, and for an account.

See 154 Fed. 213.

Alfred Wilkinson, for complainant.
Grafton L. McGill, for defendant.

RAY, District Judge. The bill of complaint herein was filed about January 18, 1907, and alleges unfair competition in trade by defendant in that the defendant has exactly copied the new, original, and characteristic search light shell of the complainant, and has made a painstaking and wholly unnecessary and exact imitation of the complainant's shell in shape, size, weight, decoration, form, and other details, so that the search light lamps of the defendant were, in appearance, substantially or exactly the same as the complainant's, and that defendant has put out and sold large numbers of his said search light lamps, and is proposing to sell others of the same make in large quantities. Also, that the defendant has knowingly, studiously, and exactly so imitated complainant's lamp for the purpose of misleading and deceiving the public, and securing the fraudulent sale and substitution of the defendant's search light lamps, so imitating complainant's, as and for the lamps of the complainant, and for the purpose of diverting profits from the complainant, and securing the advantages of the reputation of complainant's lamps and the existing demand therefor. The complaint

also alleges that many persons have been misled and deceived by such acts and imitation all to the great damage of complainant.

The bill of complaint also alleges that the peculiar design, form, and construction of his said search light lamp were new with him, and that in his trade with his customers and in his intercourse with the trade he gave to his said lamps and used, as applied thereto, the name "Flare Front," in connection with and to indicate his said lamp; and that said name "Flare Front" was originally adopted by complainant and used by him as the first one in connection with and as an indicating name for automobile lamps; and that said words were arbitrarily chosen by the complainant to distinguish his said lamps, and that the defendant has copied said name "Flare Front," and is using it in his catalogues and advertisements and with the trade in connection with his said lamps for the purposes of deceiving purchasers and palming off said imitation lamps as those of complainant, and to assist defendant in the fraudulent sale and substitution of defendant's lamps as those of complainant. Also, that defendant has sold his imitation lamp as and for the Rushmore lamp, and has represented that his lamps were the Rushmore lamps, and has so billed them to purchasers. All this is denied by the defendant except he admits, in substance, in his evidence and proofs at least, that since complainant commenced manufacturing and selling his lamps defendant has adopted the same style and form of manufacture, descending to detail, and has sold same. The defendant claims however that before he commenced making lamps in the same form and style of complainant's lamp that others had done the same thing, and that he, therefore, was only copying a lamp in general use and made and sold by many different parties. Defendant denies any purpose to defraud or injure the complainant or to palm off his lamps as to complainant's manufacture. The defendant also insists that he has sufficiently distinguished his lamp from the "Rushmore" in that he has placed a plate thereon, showing to the trade and all purchasers and users that it is of his manufacture, and not the Rushmore lamp.

The defendant was called as a witness, subpœnaed by the complainant, and he testified, among other things, that he is the proprietor and the manager of the Manhattan Lamp Works in New York City, and that he manufactures and sells the lamp marked "Exhibit B, Saxon Lamp," and that he commenced their manufacture about October, 1906. On cross-examination the defendant was asked by his counsel the following question: "The lamp made and sold by you is, to all external appearances exactly like the lamp made and sold by the complainant, Rushmore. Please explain how you came to make a lamp of this construction?" The answer was: "My idea was to make a lamp exactly the same as the Rushmore, so that some of my customers could have a Saxon lamp as well as a Rushmore." The next question was: "Did you have in mind that your customers would suppose your lamp was a Rushmore lamp?" The answer is: "I do not believe they could for my name was on the lamp. Q. Did you ever intend that they should so suppose? A. No." He then stated that he put his name plate on the lamp at a point exactly corresponding to that at which complainant's name plate is exhibited on his own lamp. This witness also testified

that on these lamps he put different name plates or different names, but he could not, or at least did not, give but one or two of these names.

The lamp in question designed and made by the complainant, as the evidence shows, is a superior and popular search light or acetylene gas lamp for automobiles. While automobiles in the large cities are coming into use for general purposes, they are largely an article of luxury so to speak. On account of their cost, they are used largely by persons of wealth who look much to the style and appearance as well as to the solidity, strength, and durability of the machine. Few purchasers or owners know anything about the mechanism, and as a rule they know less as to the quality of the materials used in their construction. The search light lamp is always prominent and attractive upon an automobile, and in the daytime should be of attractive and pleasing design, thus making it ornamental. The result is that the design and appearance of the shell of this lamp are of great importance, and, if pleasing to the trade, to purchasers, and users a particular style or form of construction may be of great value, very popular, and meet with large sales, even if it be no better or of no greater practical utility, than one of much cheaper construction. Knowing all this from experience, and much more, in December, 1905, Rushmore deemed it wise to design an ornamental and distinctive inclosing shell for his lamps for automobiles, which would give notice and a guarantee to his customers that they were securing the Rushmore lamp. The evidence shows, and it is practically conceded, that this was a superior lamp. In January, 1906, Rushmore exhibited this structure of his at the automobile show in Madison Square Garden, New York City, and it was there seen by many thousands of people, particularly by those interested in automobiles and automobile construction, fixtures, and attachments. The evidence tends to show, and establishes to my satisfaction, that the complainant, Rushmore, was the first to design this shell for search light lamps, known as the "Rushmore Lamp," Exhibit A in the proofs. It is distinctive in its type, form, ornamentation, and peculiarities. The particular form and appearance of these external parts are, almost without exception, nonfunctional. Rushmore's lamp has a new and arbitrary form of front door, rear cover, and ventilator. These he combines in one lamp, and then dressed up or ornamented the shell with arbitrary curves, beads, etc., and thus had a shell which was characteristic, novel, and attractive in appearance. All this the defendant copied to the minutest detail.

In November, 1906, the complainant was first informed that defendant was making and putting his imitation lamps on the market. He found no way to get certain proof until during an automobile exhibition at Madison Square Garden held in January, 1907, the complainant, through one J. E. Kelly, then and there purchased "Exhibit B, Saxon Lamp," at defendant's booth where he was exhibiting lamps and taking orders. Kelly told the persons in charge he had a customer who wanted a pair of Rushmore lights; that as the price was high he wanted something he could put in as a Rushmore light at a lower cost. The persons in charge told him they had a light they called the "Rushmore" light, and told Kelly they were an exact copy of the "Rushmore," if not better, and that all the parts were

the same, and sold him a pair of the 8-inch size. Kelly asked for a receipt, and received one reading:

"Saxon Motor Lamps.

"Manhattan Lamp Works.

530 West 28th Street,

New York.

"Mr. J. E. Kelly,                                                          1/17, 1907.

1 p. No. 8 in. 1 Rushmore lamps.....................................35 25

        2% for cash........................................    70

                                                                              34 55

"To be called for at 10 A. M.

"Paid.   S. Sklare."

Kelly called at defendant's factory and obtained the lamps the next day. As this lamp is in evidence, a comparison shows that it is identical with Rushmore's, even to errors in construction and immaterial and unnecessary details, so far as external appearance is concerned. Rushmore thus describes the resemblance between his lamp and defendant's lamp:

"It resembles it particularly in the use of screws upon parts that are soldered together where we use screws solely to hold the parts together; in the use of the needlessly large side socket with two set screws; in the use of very large rivets in the lower ventilator; in our 1906 lamps of this size I made a mistake in the punches and dies which compelled me to use rivets much larger than required for strength or appearances. These large rivets are copied in the Exhibit B lamp. Likewise the castings of the hinges and catch on the front door are so exact in every detail and reproduce every minor defect in similar parts in my lamp as to indicate to my satisfaction that the defendant simply removed these parts from one of my lights and used them in the foundry instead of making patterns of his own. Likewise the burner in the Exhibit B lamp is placed at a point very close to the rear of the lamp, so that it closely resembles my lamp, although when so placed the flame cannot be at the exact focal point of the cheaper and longer focal lens mirror which he employs. Q. 32. Compare said Exhibits A and B as to weight. A. The Exhibit B lamp weighs approximately 8⅛ pounds; whereas the Exhibit A lamp weighs approximately 11½ pounds. Q. 33. What does this difference in weight indicate? A. That the brass sheets from which Exhibit B lamp was made are very much lighter and cheaper; that the lens mirror is very much smaller of thinner section, and of glass of much less density. Q. 34. Does this difference in weight make any difference in your opinion of the comparative cost of the two lamps? A. It makes a very great difference, because of the lower first cost of the material, reduced loss in waste material, and in the much lower cost of the class of workmanship required to make up the lighter material. Q. 35. Will you briefly point out any features of structural superiority or inferiority in these two lamps? A. In the first place the lens mirror is of very much smaller diameter in the Exhibit B lamp. It is a much flatter curvature, very inferior glass, with the result that its focal point is so far in front of same that it is not possible to move the burner in the Exhibit B lamp far enough forward so that the inferior lens mirror may even operate at its best efficiency. In placing this burner so far back in order to copy my lamp the lamp is so made that it cannot give as good satisfaction and service as if there was no such a deliberate effort at imitation. In lights of my manufacture customers have learned that a distinctive feature is the location of our burner very close to the rear end of the lamp. As to other details of mechanical construction, whereas in my lamp I employ heavy endless brass rings on the front and back of the cylinder which are secured by rivets, the Exhibit B lamp has cheaper noncontinuous rings joined together only by soft solder. Whereas the hinges in my lamp are accurately finished in the milling machine; in the Exhibit B lamp

the parts are put together without such finishing. In my lamp the front glass is held in place between rings of asbestos; in the Exhibit B lamp there is no such packing. In my light, the parts are all made of sufficient strength that they are held together solely by the screws and rivets; in the Exhibit B lamp I notice that various parts, namely, the top ventilator, side socket hinges, bottom ventilator, are secured largely with solder."

This, if true, and I find that it is, substantially, shows more than a purpose to make and sell a lamp like or similar to the Rushmore lamp. Evidently the purpose was to copy in design and appearance to the smallest detail the Rushmore lamp, and induce users and purchasers and the trade, so far as possible, to think this was a Rushmore lamp and purchase and use it as such. The name plate was small and put, unnecessarily, in the very place where Rushmore placed his. There was nothing to attract attention to this plate, and even had attention been called to it, but few users or purchasers would have understood or would understand it was not a genuine Rushmore lamp, unless familiar with the fact that Rushmore put his own name on all lamps of his own make. It was inferior in construction and material and utility to Rushmore's and could be sold for far less at a profit. To the inexperienced these facts were not apparent, however. Rushmore had sold between 8,000 and 9,000 of these "Flare Front" lamps in 1906, but after these imitations came on the market Rushmore's sales fell off and he was compelled to reduce prices to hold his trade. That this was due to these acts of defendant cannot be doubted. They were the natural and probable results. They must have been foreseen and intended by the defendant, assuming him to be an intelligent man, which, evidently, he is. The complainant also produced the testimony of other witnesses tending to show, and showing to my satisfaction, that persons were confused and misled and deceived, and that they naturally would be, and could not at a short distance tell the one lamp from the other. That defendant was sending out to the trade these imitation lamps as Rushmore lamps is further shown by a bill made out in the handwriting of a Mr. Barron, the bookkeeper of defendant, whose first name he did not remember, so he could not be traced and found, to J. W. Leavitt & Co. of San Francisco, Cal., December 10, 1906, for lamps, among which are billed—

"2-7" Imitation Rushmore, 6.50.....................................13 00
2-8" Reg. Rushmore, 9.50..........................................19 00
1-8" Reg. Rushmore..............................................12 55"

The defendant admitted this bill was on his letter head, and was sent from his place of business, but said "the names 'Imitation Rushmore' and 'Regular Rushmore' have been inserted without my knowledge or consent." He could not remember whether or not he sent Leavitt & Co. letters stating he could supply them Rushmore lamps, or lamps in imitation of Rushmore, but admitted the entries in the bill were regular, made in regular order, and that the whole bill, except the printed part, was in the handwriting of that bookkeeper. I cannot credit the statement that this bookkeeper inserted those charges without the knowledge or consent, express or implied, of defendant. He would not have assumed to do such a thing without

authority from his employer. Evidently this bookkeeper understood the purpose of the imitation, and was carrying out the purpose of his employer, if not his express instructions. Rushmore testified that the name plates he saw on the imitation lamps sold by defendant had "a small and almost indistinguishable name plate." It seems to me that when the defendant copied Rushmore in every detail except functions, and quality of material, and weight of material, etc., in short, as to appearances, he had a purpose. This purpose is made evident when we look at what he did in putting the imitation on the market. That he did defraud and injure the complainant and, to some extent, the public, cannot be questioned. That his acts led to confusion in the trade and among purchasers and users is self-evident. The results could not be otherwise. A person must be held to intend the known and reasonably to be apprehended consequences or results of his own acts when such acts are knowingly and intentionally done. Agnew v. United States, 165 U. S. 53, 17 Sup. Ct. 242, 41 L. Ed. 624, where the following charge was said by the Supreme Court to be unexceptional as matter of law, viz.:

"The law presumes that every man intends the legitimate consequence of his own acts. Wrongful acts knowingly or intentionally committed can neither be justified nor excused on the ground of innocent intent. The color of the act determines the complexion of the intent. The intent to injure or defraud is presumed when the unlawful act, which results in loss or injury, is proved to have been knowingly committed. It is a well-settled rule, which the law applies in both criminal and civil cases, that the intent is presumed and inferred from the result of the action."

This rule is inexorably applied in criminal cases, and is clearly applicable in such a case as this. The rule applicable in ascertaining intent is admirably stated in vol. 4, Wigmore on Evidence, pp. 3388, 3389, 3390, § 2413, as follows:

"The elements of an act, in themselves considered, being its subject, its terms, and its final utterance (ante, § 2404, par. 1), it is obvious that these must all be preceded and brought into being by some sort of volition or intent. The result, however, that is thus brought into outward being does not always correspond with the inward intent; and the problem thus arises (ante, § 2404, par. 2) how far either the expression or the intent shall be treated as legally paramount the one to the other. * * * In order to solve the problem, it is indispensable that the different possible meanings of the words 'intent' or 'intention' be kept apart, and that the distinction between 'volition' and 'intention,' in the proper sense of the words, be established. * * * It may be assumed, then, that there must at least be a volition of some sort preceding every legal act. But it is also apparent that the act, as expressed and apprehensible to the world at large, or to the other party in particular, may not be such an act as was intended. In those cases, then, where a volition was exercised, but the outward consequences were not produced according to intention, are we to say that because there was a volition, the person is necessarily to be fixed with all the consequences, of whatever sort they be? Or are we to say that, because there was no intention of certain consequences, the person is necessarily not to be fixed with them? We are to accept neither solution in this absolute form. The latter solution is not fair to the community dealing with the person. The former solution is not fair to the person himself. No practical system of law could be content with either, applied in rigid uniformity. The established doctrine of tortious responsibility suggests an analogy and provides a solution. We are to fix the person with such expressed consequences as are the reasonable result of his volition. In other words, the act as legally effective will be determined in respect to

the three elements of subject, terms, and finality, by that expression of it which results, to the other person in the transaction, as the consequence, reasonably to have been anticipated under all the circumstances, of the volition of the actor. This avoids on the one hand the impracticality of the merely external standard, so far as it would have held the person liable for an apparent act which was not the reasonable consequence of his conduct; and, on the other hand, it avoids the impracticality of the merely internal standard, so far as it would have exonerated the person from an unintended consequence which he ought to have foreseen and might have avoided. In short, it adapts, to the general doctrine of legal acts, the test of negligence, i. e., responsibility resting on a volition having consequences which ought reasonably to have been foreseen."

It is always difficult to obtain evidence in such cases. Those who knowingly participate in the wrongdoing are loth to divulge, and those in the trade who have been deceived and who, in turn, have innocently misled others by selling them the imitation article when they supposed they were selling the genuine, and the purchaser supposed he was getting the genuine, are slow to confess or admit the imposition. In short, it is not usual for a dealer to admit, unless necessary, that he has been imposed upon, and even the owner of a machine who discovers that he has purchased and is using an inferior lamp, when he supposed he had the genuine, is slow to announce the fact. This is the common experience of mankind. Rushmore was under no obligation to await further developments—further deceit, further injury. He was under the necessity, would he protect himself, of acting promptly. "Wrongs which are the probable result of given means should be prevented, not awaited." Lanahan v. John Kissel & Son (C. C.) 135 Fed. 899–903.

In the judgment of this court the complainant has established his case on this branch of it by such a preponderance of credible evidence, much of which has not been referred to, that it is made out beyond a reasonable doubt. Even if the evidence is not sufficient to establish that persons have been actually deceived, it is all-sufficient that "the resemblance is such as would be likely to cause the one mark to be mistaken for the other." Amoskeag Mfg. Co. v. Trainer, 101 U. S. 51–63, 25 L. Ed. 993; National Biscuit Co. v. Baker (C. C.) 95 Fed. 135. The user, not the dealers, are the ones to consider. Same cases. I think this case is squarely within Enterprise Manufacturing Company v. Landers, Frary & Clark (C. C. A., Second Circuit) 131 Fed. 240, 65 C. C. A. 587, where the facts were quite similar. In that case, among other things, Judge Lacombe, in giving the opinion of the court, said:

"But defendants overlooked the fact that a court of equity will not allow a man to palm off his goods as those of another, whether his representations are made by word of mouth, or, more subtly, by simulating the collocation of details of appearance by which the consuming public has come to recognize the product of his competitor."

And as to what constitutes unfair trading, and as to the proof necessary, he also said:

"This is a most aggravated case of unfair trading. Usually, in these cases, the defendants so dress their goods as to present a number of points of difference, on which they rely when charged with intent to deceive; insisting that, although there may be resemblances, the differences are so great as to

preclude any idea that they had sought to produce confusion. Here, on the contrary, they have not only conformed their goods to complainant's in size and general shape, which was to be expected, but also in all minor details of structure—every line and curve being reproduced, and superfluous metal put into the driving wheels to produce a striking characteristic effect—while the goods are so dressed with combinations of color, with decorations reproduced or closely simulated, with style of lettering and details of ornamentation, that, except for the fact that on the one mill is found the complainant's name, and on the other the defendant's, it would be very difficult to tell them apart. It is elementary law that, when the simulation of well-known and distinctive features is so close, the court will assume that defendants intended the result they have accomplished, and will find an intent to appropriate the trade of their competitor, even though in their instructions to their own selling agents they may caution against oral misrepresentations as to the manufacture of the goods. There is evidence to show that purchasers have been deceived as to the identity of these mills, but, in the case of a Chinese copy, such as defendants offer to the public, such proof is hardly needed."

See, also, Marvel Co. v. Pearl, 133 Fed. 160, 66 C. C. A. 226, where the court points out the distinction between imitating the functional and mechanical construction essential to the proper operation or making of the device and imitating the general form and appearance or ornamentation essential to commercial success from the standpoint of taste and attractiveness. Here, defendant was not striving to make as good a lamp as complainant's, but one he could sell as and for it.

Coming to the other branch of the case, the alleged unlawful appropriation and use of the name "Flare Front," we find more difficulty. That name, in no grammatical sense, is descriptive. But a descriptive name, or a name which to some extent is descriptive, if this be such, may come to have a secondary meaning, one which when heard or seen indicates to the trade, and to purchasers and users of a certain article, the goods or manufacture of a certain maker; those of the one using the name, and no other. It then becomes the trade-name of that particular manufacturer using it to designate his goods, and as such is entitled to protection, provided he solely and arbitrarily selected and appropriated it. This is true when another making the same article in close imitation applies to such imitation the same name, and also applies it to the same article not made in close imitation, if it be done to defraud and palm off such goods or article as the manufacture of the one first arbitrarily selecting and using the name as a distinguishing one for his goods. Of course it must be so used to deceive the consumer. There can be no question that the complainant, Rushmore, arbitrarily selected the name "Flare Front," and used it to designate and distinguish his lamp from all others. "Flaring Front" and "Flared Front" had been used by others, in connection with other words, in giving a description of their lamps. For instance in defendant's Exhibit "Solar Catalogue of 1904," put out by the Badger Brass Manufacturing Company to advertise and illustrate their lamps, and on which defendant relies, we find, "Generator Lamps," Illustration—"Model 64A and 66A are high grade lamps of rakish design and foreign style, giving a long effect to car. Made of brass, except front, lens, rim, and back are of copper; doors open only in back which holds mirror reflector. Flared fronts are aluminum lined." This is clearly descriptive of a class of lamps; certain ones of which have "flared

fronts," and the term "flared fronts" is not a distinguishing name given to those lamps which have a flaring front. It is not a name given to the lamp at all for any purpose. It means simply, that the flared fronts of lamps having such fronts are aluminum lined. The words "flared fronts" are not used to indicate the lamps of the Badger Brass Manufacturing Company. Not so with Rushmore's novel selection of the name "Flare Front." "Flare" is a verb and also a noun. "Front" is a noun. The words "Flare Front" are simply the novel and unusual use of two nouns and either a compound word not used by anyone before, so far as appears, or the meaningless combination of a verb with a noun or an arbitrary, ungrammatical, meaningless (grammatically speaking) combination of two words, nouns, for a purpose—the purpose of giving an unusual and a distinguishing and distinctive name to this article of manufacture. The participles of the verb "flare" are, past "flared" present "flaring." Participles are properly used as adjectives. Verbs alone are not. Nouns may be used as adjective modifiers. But they are of two kinds, possessive and explanatory, as Solomon's temple, and, Hughes, the Governor. Here "front" is not used to explain "flare," and "flare" is not properly used to explain "front." It should be "flared front" or "flaring front." We would hardly say "robin bird," but "the bird, a robin," etc. Hand is a noun; saw is a noun. We say or write handsaw as one word or hand-saw as a compound word. Hence in the Badger Catalogue, Exhibit "Solar Catalogue of 1904," we have the word "flared" properly used as an adjective to indicate a certain kind of fronts. Those spread out or one which will cause the light to wave or flutter or burn with a flaring flame. All this is usual and clearly and properly and grammatically descriptive. Rushmore did not select or make a compound word, as it is not hyphenated and could not be, grammatically, if he used the verb. Clearly, in using the word "front," he intended the mechanical front of his lamps, not the light it would give or the function it would perform. He used the word "flare" as an adjective probably, but, if so, he used it improperly, and ungrammatically, strictly speaking, and arbitrarily, and intended so to do in order to coin a new and a distinguishing name for his lamp. It might indicate that his front was one that would cause a glaring, wavering light to emanate therefrom, or that the front spread outward, or that it was an "ostentatious" showy lamp or front. See Century Dictionary. It became his trade-name after long use as surely as would have the use of any name absolutely unknown to the English language. It was a new coinage and a coinage for a legitimate purpose, and was so appropriated by complainant. Defendant had no right to appropriate it to aid him in palming off on purchasers and users the lamp of defendant as that of complainant's manufacture. This is what the defendant did, and in the Saxon Catalogue of Automobile Lamps we find him illustrating and advertising the "Flare Front, all brass search light," one of which, to all external appearance, is an exact duplicate of complainant's "Flare Front search light lamp." Rushmore describes his as "the new flare-front search light" and specifies that this has "a large flaring front."

My attention is called to patents to Miller, to Gray, and to Williams, as showing the use of bicycle and vehicle lamps with flaring fronts,

and described by Miller as "a large flaring lens-holding collar D, extends forward from the front portion A," etc., and by Williams as follows: "The opening at the front is surrounded by an outwardly-flaring reflector," etc. These are natural and grammatical descriptions, but have no tendency to show that any one ever used the distinguishing words "Flare Front" prior to their arbitrary adoption by the complainant. Complainant does not contend that "Flare Front" had come to be the sole distinguishing name by which his lamps were demanded, sought, sold, and purchased by dealers or users. Usually they knew the name of the maker, and frequently asked for the Rushmore lamp. However, this fact does not defeat complainant's remedy.

Unfair competition in trade, when found to exist, should be discouraged, not encouraged or sanctioned, and the restraining power of the court extends to the use of all the means and devices resorted to by the offending party to consummate it. Some particular act, which, standing alone, would not constitute unfair trade, may be restrained with others, all together constituting the unfair trade process resorted to. Hopkins, Unfair Trade, pages 87 and 88, § 40; Lever v. Goodwin, 4 R. P. C. 492–506; 36 Ch. Div. 1; 57 L. T. 583; 36 W. R. 177. In the case first cited Lord Justice Cotton said:

"There may be no monopoly at all in the individual things separated, but if the whole are so joined together as to attempt to pass off, and to have the effect of passing off, the defendants' soap as the plaintiffs', then, although the plaintiffs have no monopoly either in 'Self-Washing' or 'Self-Washer' or in the parchment paper or in the spaced printing, yet if those things in which they have no sole right are so combined by the defendants as to pass off the defendants' goods as the plaintiffs', then the defendants have brought themselves within the old common-law doctrine in respect of which equity will give to the aggrieved party an injunction in order to restrain the defendant from passing off his goods as those of the plaintiff."

Hopkins further says, page 88:

"The doctrine of unfair competition, by which the use of descriptive words has sometimes been restrained, has engrafted upon it this important qualification—that in no case will the use of a merely descriptive word be restrained as deceptive, unless in circumstances which show fraud on the part of the user."

Such is this case as to the words in question.

It is settled by scores of decisions that one may not use "his own name, or that of another, in a manner willfully calculated to deceive the public into a belief that his goods are the goods of the plaintiff who bears the same name. This presents a state of facts that warrants the invocation of the injunctive power of equity; the decisions being practically unanimous." Hopkins, Unfair Trade, page 106, § 53 (b). See cases there cited. "Where the name is one which has previously thereto come to indicate the source of manufacture of particular devices, the use of such name by another, unaccompanied by any precaution or indication, in itself amounts to an artifice calculated to produce the deception alluded to," etc. Hopkins, Unfair Trade, p. 107, § 53 (b). See cases there cited.

In California Fig Syrup Company v. Improved Fig Syrup Co. (C. C.) 51 Fed. 296, 297, Mr. Justice McKenna, then Circuit Judge, now of the Supreme Court, U. S., said:

"Respondent urges that the words 'Syrup of Figs' are descriptive, and that complainant deceives when it uses them to designate its compound. The deceit does not appear on the face of the bill, and it is unimportant if they are descriptive. The question is now, not whether complainant has the exclusive right to use the words 'Syrup of Figs' or 'Fig Syrup,' but it is whether respondent has, by use of them and other words, and by the other imitations alleged and exhibited, so far imitated the form of complainant's device and description to represent its goods as its goods, and appropriate its reputation and trade. The gravamen of the action is the simulation of complainant's devices and the deception of purchasers. This is the principle of the best-considered cases, uniting them, notwithstanding their diverse facts."

These "syrup of fig" cases were up in Improved Fig Syrup Co. v. California Fig Syrup Co., 54 Fed. 175, 178, 4 C. C. A. 264; California Fig Syrup Co. v. Stearns (C. C.) 67 Fed. 1008; California Fig Syrup Co. v. Frederick Stearns & Co., 73 Fed. 812, 814, 20 C. C. A. 22, 33 L. R. A. 56; California Fig Syrup Co. v. Warden (C. C.) 95 Fed. 132; Clinton E. Worden & Co. v. California Fig Syrup Co., 102 Fed. 334, 42 C. C. A. 383. The Warden Case was reversed by the Supreme Court of the United States (Warden v. California Fig Syrup Co., 187 U. S. 516, 23 Sup. Ct. 161, 47 L. Ed. 282), but on the point that plaintiff had misrepresented its goods, and was not entitled to the protection of a court of equity. The Supreme Court, however, took pains to affirm the lower court on the point under discussion in the case at bar, and said, page 527 of 187 U. S., page 163 of 23 Sup. Ct. (47 L. Ed. 282):

"The courts below concluded, upon the evidence, that the defendants sold a medical preparation named, marked, and packed, in imitation of complainants' medicine, with the design and intent of deceiving purchasers and inducing them to buy defendants' preparation instead of the complainants'. We see no reason to dissent from that conclusion, and, if there were no other questions in the case, we should be ready to affirm the decree, awarding a perpetual injunction, and an account of the profits and gains derived from such unfair and dishonest practices."

It is of course true that every one is at liberty to use the ordinary descriptive words of the English language to describe goods of his own manufacture. But when one has designedly and arbitrarily taken an unusual and an ungrammatical combination of two words, even if they do suggest an idea and a correct one of the construction or utility of the article, as his designating and distinctive name for his article of manufacture, and by long use it has come to be so understood by the purchasers and users thereof, a competitor has no right to use it for the purpose of deceit. This is especially true even in cases when the combination is of letters merely. And, even if the letters used in the combination are not the same and the sound, when pronounced, is not the same, if the idea conveyed be the same, and fraud or confusion results, or is likely to result, there is unfair competition in trade. Thus, in National Biscuit Co. v. Baker et al. (C. C.) 95 Fed. 135, the word "Uneeda" read "You need a biscuit." The defendant used the word "Iwanta." This read "I want a biscuit." Judge Lacombe held "both name and dress," referring to the package, "are clearly calculated to mislead." As the dress or package and the word were together used to defraud, Judge Lacombe en-

joined the use of both. Quite likely he would not have enjoined the use of "Iwanta" alone, if that had been all defendant did.

Here, defendant takes the precise combination of words, violating the prevailing rules of dictionary and grammar as well as complainant's rights, all for the purpose of defrauding him and the purchasers and users of the lamp. I think it a clear case for an injunction. An extensive collection of pertinent cases will be found in Hesseltine, The Law of Trade-Marks and Unfair Trade, pages 272 to 279, inclusive.

There will be a decree for the complainant, covering both the making and selling of the shell and the use of the words, with costs.