LANAHAN et al. v. JOHN KISSEL & SON.

(Circuit Court, E. D. New York. February 24, 1905.)

1. TRADE-MARKS—INFRINGEMENT—"HUNTER WHISKEY."

Complainants and their predecessor since 1860 have sold a brand of whiskey for which they adopted and used as a trade-mark the arbitrary word "Hunter," and their product became widely known throughout the country as "Hunter Whiskey," and was the only whiskey known to the trade by that name, although the word "Hunter" was used by some other small dealers at various times, in combination with other words, as the name of a whiskey having a local market. Purchasers in bulk in some cases bottled the whiskey, using on the bottles white labels furnished by complainants, having thereon the words "Hunter Baltimore Rye Whiskey," with the name of the immediate vender as bottler, and also a picture of a uniformed man on horseback. Complainants also sold some of their product in bottles having a dark label with the word "Hunter," in white letters, conspicuously shown thereon, and a white medallion in the center, containing the same picture. After 1900 defendants began the sale of whiskey in bottles having a white label, with the picture of a huntsman on foot, with dogs, thereon, and the words "White Label Hunter Whiskey, Bottled by," followed by their own name and address. *Held*, that such labels were an infringement of complainants' exclusive right of trade-mark in the word "Hunter," and were calculated and evidently designed to induce the belief on the part of purchasers that the whiskey was that of complainants, bottled by defendants.

2. SAME—RIGHT TO INJUNCTION—PREVENTION OF THREATENED INJURY.

The infringement of a trade-mark implies injury, and, where it is of such character as is calculated to deceive purchasers, the owner is not bound to wait until injury has actually resulted, before he can maintain a suit for relief by injunction.

In Equity. Suit to enjoin infringement of trade-mark.

Wise & Lichtenstein (Morris S. Wise, of counsel), for complainants.
Hess & Holstein (Charles A. Hess, of counsel), for defendant.

THOMAS, District Judge. In 1860 one William Lanahan, the predecessor of the present complainants, at Baltimore, Md., first adopted as a trade-mark the arbitrary word "Hunter" for the purpose of identifying and distinguishing whiskey made and sold by him. At that time and for some years thereafter such Lanahan and his successors sold

such whiskey in bulk, but purchasers, for the purpose of reselling, often bottled the liquor, and placed on the bottles white labels carrying in script type the words

"Hunter
"Baltimore Rye
"Whiskey."

Below these words, and between the word "trade" and the word "mark," was the picture of a uniformed man on horseback. Beneath the picture were either the words "Wm. Lanahan & Son, Baltimore, Md.," or the name and address of the immediate vender—for instance, "Johnson & Ascher, 819 North Clark St., cor. Wisconsin St., Chicago.

In the year 1894 the complainants, who had succeeded to all former rights of the first Lanahan, began to sell whiskey in bottles, continuing also the sale in bulk, and attached to each bottle a label of the following description: A dark background, with a white medallion center, containing a horse with a uniformed rider, holding a hat in his right hand (the same picture shown on the white label), with the word "trade" at the left, and the word "mark" at the right thereof; above the picture, in large white capital letters, the word "Hunter," and below the picture the words, in white capital letters, "Baltimore Rye Bottled by Wm. Lanahan & Son, Baltimore." The complainants continued to furnish the white label to their customers, which, when desired, was used by them for bottling whiskey purchased in bulk, and the complainants also supplied bottles for bar purposes carrying the word "Hunter." The complainants' whiskey in bottles and in bulk, as above described, has been sold generally throughout the United States, and has also been sold in Europe, Central America, and South America. It is proved that in the trade the complainants' whiskey only is known as "Hunter Whiskey," and that, when "Hunter Whiskey" is called for, the complainants' goods are intended and are supplied. There is evidence, making imperfect proof, that whiskey has some sale in bottles bearing a dark label with a white medallion therein, showing a huntress on horseback; the label bearing the words "Old Hunter Belle Rye, 17 Years," etc. It is alleged that it is bottled and sold by "The Consolidated Hopewell Co.," of Cincinnati; but such company is of very recent formation, and apparently is unknown to the trade. There is no evidence that the complainants had knowledge of this brand until the evidence herein was taken.

The evidence shows that V. E. Shields & Co., of Cincinnati, Ohio, bottle and sell, and have sold since 1873, whiskey bearing the name "Hunter's Own." V. E. Shields & Co. on December 7, 1875, registered a trade-mark designated "Hunter's Own Bourbon," but the words "Hunter's Own" were used by Shields to designate both rye and bourbon whiskey sold by them, whether in bottles or in bulk, and a bar decanter carrying such words was supplied to their customers. While Shields' sales have not been specifically located, yet they have been made to persons at several places in the United States; the total thereof having been, as nearly as Mr. Shields ventured to estimate, "a thousand or two" cases, while complainants' sales of "Hunter Whiskey" in 1902 reached 40,000 cases. The complainants had no knowledge of the Shields brand, except as this suit disclosed its existence. Indeed, Ot-

tenheimer, engaged in the liquor business since 1871, and Peebles, grocers, importers, and large dealers in wines, liquors, and whiskies, each located at Cincinnati, testified that he had never heard of the "Hunter's Own" brand.

As early as 1870, whiskey was sold in bulk, and barrels were branded "Hunter's Game," by D. P. Ely's Nephews, and later by their successor, Frank Seaman, and it is still sold in Brooklyn, N. Y., and to a slight extent elsewhere. About 200 barrels a year have been sold to small jobbers and retail dealers, and of late 80 per cent. of it in Brooklyn. The business was disturbed, but not terminated, by Mr. Seaman's bankruptcy in 1898. The complainants had no knowledge of it, and it is not known to the trade as "Hunter Whiskey."

The only other brand meriting discussion is that on which is printed, in white letters, "Whiskey Distilled by Louis Hunter 1870," with the word "trade" at the left, and the word "mark" at the right, of the date. Below the date is this:

"Harrison Co., Ky. Pure Rye. The Louis Hunter 1870 whiskey and pertaining labels and brand are our exclusive properties and will be legally defended against all infringements. J. & A. Frieberg."

It has not been sold with the black label, with inscription in white letters, since 1901. It appears that in or after 1870 there was a distillery located in Harrison county, Ky., and that one Louis Hunter conducted it, and sold liquor in packages branded "Louis Hunter," and later the figures "1870" were added. The interest passed finally to one S. J. Craig in 1878, who operated the distillery to 1879 or 1880, when he ceased operations. Thereafter Craig sold to others, who opened the distillery as the "Sharpe Distillery," and eliminated the name "Louis Hunter" from the distillery and its trade. Since about 1883, Frieberg, of Cincinnati, Ohio, has been selling whiskey, using the label "Louis Hunter 1870" as a trade-mark. This brand is not known as "Hunter Whiskey," and the goods are not sold generally, actively, or extensively. It appears that in 1900 one of the complainants first had knowledge of this brand, although complainants' agent in New York testified that he had seen the brand in windows of dealers in three or four instances.

The defendants recently began to use the word "Hunter" on their labels, and the complainants duly filed the present bill. The ground of defendants' label is white, containing the picture of a huntsman and dogs, with the word "trade" at the left, and the word "mark" at the right, side thereof, and the words "Full Quart" at the lower corner of the picture. Above the picture are the words, "The Cream of all Whiskies," in large black type, beneath which, in smaller black type, are the words "Absolutely Pure." Beneath the picture are the words:

"White Label
"HUNTER WHISKEY
"Bottled By
"John Kissel & Son
"Brooklyn,"

—All in black type. The words "Hunter Whiskey" are much larger and heavier than other parts of the inscription, and at once and primarily catch the eye and attention. The defendants solicited custom from the

trade by cards offering "White Label Hunter Whiskey," but the signature was "John Kissel & Son, Brewers and Distillers, 169 Harrison Ave. cor. Wallabout St., Brooklyn, N. Y." In the circular was the following: "We guarantee prompt protection to customers against any intimidation." This language indicates either that the defendants were raising an issue, or that some one had raised an issue, concerning the label used. Defendants, by their labels, in effect, stated that they offered for sale "Hunter Whiskey Bottled by John Kissel & Son." There is but one "Hunter Whiskey" known to the trade, to wit, that of the complainants. Therefore the defendants' assurance is, in its effect, an offer of complainants' "Hunter Whiskey," bottled by the defendants. Such is the necessary interpretation of the language. Such thought was conveyed to the public. Starting with the thoroughly established fact that only one "Hunter Whiskey" is known, it follows that a person proffering "Hunter Whiskey" must be deemed to mean the only "Hunter Whiskey" of whose existence there was knowledge, and of whose existence there was in fact wide knowledge. This intention to offer complainants' "Hunter Whiskey" is not modified by the fact that the defendants' label states that it is "Bottled by John Kissel & Son." Such statement rather emphasized the assurance, because it was the custom of dealers in complainants' product to sell "Hunter Baltimore Rye Whiskey" purporting to be bottled by the complainants or by the person or firm bottling and offering it for sale. The defendants' statement that they bottled "Hunter Whiskey" merely classed them with the great number of persons who did the same thing. But the defendants placed above the words "Hunter Whiskey" the words "White Label." This does not qualify, but rather tends to accentuate, the statement that it is complainants' "Hunter Whiskey," because all complainants' purchasers who bottle "Hunter Whiskey" bought in bulk use white labels. The letters on the complainants' black label are large and white, and, together with the white medallion, are the striking elements of the label. These common and well-known facts the defendants, by design or by singular chance, have used of late to promote the sale of their own goods. Their statement then became as follows, in effect: "This is the 'White Label' Hunter Whiskey, which we bottle." Hence unwary persons, in a general way associating white labels with "Hunter Whiskey," would be attracted by defendants' white label, and the assurance that it was in fact "White Label Hunter Whiskey," bottled by defendants. It is true that the defendants showed a hunter afoot, and not on horseback; but the label conveyed to the mind of an observer the thought of a huntsman, which idea complainants' label also suggested. In varying forms, the pictures result in the same conception. A person of accurate knowledge and observation would detect the differences in the details of the pictures. The general or indifferent observer would quite probably often recall only that the genuine Hunter label displayed the picture of a hunter. However that may be, the differences in the pictures would not suggest to the ordinary observer that the "Hunter Whiskey" bottled by defendants was not the complainants' product. The other words of commendation appearing on defendants' bottles would not distinguish to such person that complainants' article was not offered.

The fact seems to be that the complainants' wide and persistent advertisements, the long-established fame resulting therefrom and from the use of their goods, had given their whiskey a certain name, to wit, "Hunter." Purchasers from complainants had further identified the goods by using white labels, or, if sold in original bottles, the large white letters and white medallion, made more apparent on the black ground, had to some extent associated white labels with the goods. The defendants gathered all these phenomena, known to the public more or less accurately, and used them on their own label to market their goods. Why did they select the words "Hunter Whiskey," if they did not seek to avail themselves of complainants' reputation? Why did they use white labels, unless they wished to suggest the white labels often used on complainants' goods? Why did they depict a hunter, unless they wished to avail themselves of such knowledge as people possessed that a hunter was displayed on complainants' label. Of course, much that defendants did they had a right to do; but, when all they did is considered, in connection with the use of the word "Hunter," it is easily concluded that they intended to facilitate the sale of their goods by assimilating their description to that shown on complainants' label.

It is concluded that complainants have a special property in the use of the word "Hunter" as a trade-mark, for the purposes for which they use it; that the defendants have infringed thereon; and that the defendants have designedly used such trade-mark for the purposes of unduly marketing their goods. It is true that there is no evidence that any specific person has been deceived. The object of injunctive relief is to prevent injury, threatened and probable to result, unless interrupted. Why should a person be required to stand by and see his property impaired, before he may stay the hand of the person seeking to offend? Actual injury may be the best evidence of its own existence, but a person should not be compelled to abide the results of trespass for the purpose of obtaining evidence of its injurious effects. Wrongs which are the probable result of given means should be prevented, not awaited. The infringement of the trade-mark implies injury. Such use as the defendants made of it shows that actionable injury would be the probable result of their conduct.

It is urged that the complainants for a time countenanced an advertisement that their whiskey was pure rye whiskey, and 10 years old. Even so; there is not proof that it was not ten years old, nor is there proof that it was not pure rye whiskey. The evidence seems to show that whiskey may be pure, although it is blended, and not distilled in the form in which it is sold. It is blended. But how? What are the constituents? This does not appear. The defendants, to avoid the consequences, and to retain the benefits of their wrong, accuse the persons whom they have injured of fraud. They are bound to make proof of their accusation. It is considered that they have failed.

As already stated, none of the persons, except the complainants, using the name "Hunter," sold an article that was known as "Hunter Whiskey." If a person inquired for "Hunter Whiskey," he would not have received "Louis Hunter 1870 Pure Rye," "Hunter's Own," "Hunter's Game," or "Old Hunter Belle Rye." All, unless, maybe,

the "Louis Hunter 1870 Pure Rye," had small sales, largely localized. The "Louis Hunter" existed. It had no broad popularity. If it went into many states, it had no such general sale therein as to establish for it a general reputation. If it should be judged by the tardy and scant sales testified to by some of defendants' witnesses, the demand for it was so slight as to be negligible. But the essential point is that it is not "Hunter Whiskey." If it is anything, it is "Louis Hunter 1870 Pure Rye," and is so known. In any case, the existence of these brands does not impair the complainants' property in the word "Hunter," nor their right to protect it from defendants' encroachment.

The complainants should have a decree pursuant to the above views.