SOL BERNSTEIN, Doing Business as "WESTERN RANCHMAN OUTFITTERS",

*Plaintiff and Respondent,*

vs.

SAM FRIEDMAN, *Defendant and Appellant.*

(No. 2317; June 26th, 1945; 160 Pac. (2d) 227)

18

For the Plaintiff and Respondent the cause was submitted upon the brief and oral argument of Harry B. Henderson ,Jr., Esq., of Cheyenne, Wyoming.

For the Defendant and Appellant the cause was submitted upon the brief and oral argument of M. A. Kline, Esq., of Cheyenne, Wyoming.

## OPINION

BLUME, Chief Justice.

The plaintiff in this case, doing business under the name of Western Ranchman Outfitters, sued the defendant to compel him to remove from his store a sign reading, "Western Outfitters", with a picture of a man wearing the regalia of a Western ranchman or cowboy placed between the two words. After the trial of the case the court found that the sign of the defendant would be likely to mislead the public into thinking that

the defendant's store is the plaintiff's store; that plaintiff has used the name of Western Ranchman Outfitters for many years, and that the name has become known to the public as connected with the plaintiff's store; that, accordingly, the defendant should be enjoined from using the words, "Western Outfitters", with or without symbols in connection with advertising, displays, sign or signs, or in any other form, and that the sign now used by the plaintiff should be removed within thirty days. From the judgment so entered the defendant has appealed to this court.

The plaintiff adopted the name of Western Ranchman Outfitters to designate him as the party carrying on his business under that name. The words of that name are descriptive, "Western" designating the region in which the business is carried on, or in connection with "Ranchman" denoting the probable buyers of plaintiff's goods. The term "Outfitters", too, is a common word, designating the business in which the plaintiff is engaged. The terms adopted constitute a trade name, not a trade-mark, as technically known. The distinction is pointed out in 52 Am. Jur. 512, where it is said that: "It may be stated generally that a trademark relates chiefly to the thing sold, while a tradename involves also the individuality of the maker not only for protection in trade and to avoid confusion in business, but also to secure the advantages of a good reputation. In other words, a trade-mark is applicable to the vendible commodity to which it is affixed, while a tradename is applicable to a business and its good will." Nims on Unfair Competition and Trade-Marks, p. 386, states that trade marks and trade names to a certain extent overlap. "One distinction is that a trademark 'is applicable only to a vendible article of merchandise to which it is affixed,' while a 'trade-name relates to a business and its good will rather than a vendible commodity.' 'Trade-name' has, however, a some-

what broader meaning than this, although it is not really capable of exact definition. It includes, in general, names which perform the functions of trademarks, but which are not susceptible of being set apart to the exclusive use of one concern." On p. 81, the same authority states that, "a business or trade name is one that identifies a particular concern, or the goods of one concern. When such a name is fanciful it is a trademark. Where it is a word in the public domain but used in a trade sense, it is a trade name." See also 3 Restatement of the Law of Torts, § 716 and Comment A. Section 117-101 Rev. St. 1931, protects "a label, trade mark, stamp or form of advertisement." The term "trade name" is not specifically used. But the trade name used by the plaintiff as well as the sign complained of, used by the defendant, may both be said to be a "form of advertisement", so that we are not prepared to say that the statute did not intend to cover the situation here involved. We do not think that it is necessary to decide that exact point. However, the law of trade-marks, trade names and form of advertisement are all branches of the general law of unfair competition ,and while differing to some extent, necessarily rest upon the same general principle. See Nims, supra, p. 387.

Generic terms, including geographical terms, such as used by the plaintiff in this case, are not, when only used in their primary sense, subject to the exclusive appropriation as a trade name. 52 Am. Jur. 541-548; 63 C. J. 346-356. But these terms may acquire a larger, more distinctive meaning, commonly called a secondary meaning, to identify the business or goods of a party, and when such secondary meaning has been acquired, the person, firm, or corporation, using such trade name is entitled to protection against the use of it by another in the territory in which the name is understood in a secondary sense. 63 C. J. 433-434, 442-445; 38

Cyc. 769-771; 52 Am. Jur. 554; Note 150 A. L. R. 1100-1101; Nims, supra, p. 78. In fact, some of the cases appear to hold that the protection afforded a name with a secondary meaning does not differ from the protection afforded a trade-mark, although other cases hold that this is not quite true. Note 150 A. L. R. 1123-1124. We find a good illustration of a trade name in the term "Denver Dry Goods Company", a company well known in Colorado and in some parts of Wyoming. It has existed for a long time, and has become a distinct institution. We have no doubt that courts would protect it against the use of that name by another within the territory in which it is well known and is doing business. See Colorado National Company v. Colorado National Bank of Denver, 95 Colo. 386, 36 P. 2d 454.

The law applicable to cases such as that before us appears to be well settled. The difficulty lies in the application thereof to the facts in the case. Numberless cases have been decided on questions similar to that before us and we shall content ourselves by referring to but a few of them. In the case of Elgin National Watch Company v. Illinois Watch Case Company, 179 U. S. 665, 45 L. Ed. 365, 21 Sup. Ct. 270, the name of "Elgin", used in connection with watches, was sought to be protected. The court, among other things, said:

"But it is contended that the name 'Elgin' had acquired a secondary signification in connection with its use by appellant, and should not, for that reason, be considered or treated as merely a geographical name. It is undoubtedly true that where such a secondary signification has been acquired, its use in that sense will be protected by restraining the use of the word by others in such a way as to amount to a fraud on the public, and on those to whose employment of it the special meaning has become attached. In other words, the manufacturer of particular goods is entitled to the reputation they have acquired, and the public is en-

titled to the means of distinguishing between those and other goods; and protection is accorded against unfair dealing whether there be a technical trademark or not. The essence of the wrong consists in the sale of the goods of one manufacturer or vendor for those of another. * * * But where an alleged trademark is not in itself a good trademark, yet the use of the word has come to denote the particular manufacturer or vendor, relief against unfair competition or perfidious dealing will be awarded by requiring the use of the word by another to be confined to its primary sense by such limitations as will prevent misapprehension on the question of origin."

In Northwestern Knitting Co. v. Garon, 112 Minn. 321, 128 N. W. 288, the plaintiff conducted its business under the name of Northwestern Knitting Company. The defendant thereafter started to do business under the name of Northwestern Knitting Mill. The defendant was enjoined from using that name, the court saying among other things:

"We have no particular difficulty in according to plaintiff the relief demanded. Plaintiff was incorporated under the particular name, and for over 20 years had carried on its business thereunder. It advertises as the 'Northwestern Knitting Company,' delivers its product to the trade under that name, and has established an extensive and profitable business. While the name is geographical and descriptive, plaintiff clearly has, under our decisions, as well as under decisions of other courts, tradename rights, and is entitled to protection therein under the doctrine of unfair competition. Rickard v. Caton Business College, 88 Minn. 242, 92 N. W. 958; Nesne v. Sundet, 93 Minn. 299, 101 N. W. 490, 106 Am. St. Rep. 439; Howe Scale Co. v. Wyckoff, Seamons & Benedict, 198 U. S. 118, 25 Sup. Ct. 609, 49 L. Ed. 972; Newby v. Oregon Ry. Co., Fed. Cas. No. 10,144. * * * In trade-mark cases the wrongful appropriation of the mark of another authorizes equitable relief, without reference to fraud or deception; but fraud, express or implied, is essential to relief in cases where only a tradename is involved. This fraud may be shown by direct proof, or it may be inferred from

circumstances, or conclusively presumed from the acts and conduct of the defendant, without regard to his specific intent or good faith. Church & Dwight v. Russ (C. C.) 99 Fed. 276; Griswold v. Harker, 62 Fed. 389, 10 C. C. A. 435; Fuller v. Huff, 104 Fed. 141, 43 C. C. A. 453, 51 L. R. A. 332. If it affirmatively appears that the later user of a particular name intends to deceive the public, or wrongfully to appropriate the business of his rival, equity will interpose its restraining authority; and in those cases where his conduct in making use of the name necessarily and naturally will result in confusion and deception the law will, even in the face of a protest of good faith, conclusively presume the fraud essential to equitable relief."

In American Products Co. v. American Products Co., 42 Fed. 2d 488, the plaintiff was a Delaware Corporation, and the defendant a Michigan Corporation. The court, enjoining the defendant from the use of the name, stated in part:

"It is urged by the defendant that the name of the plaintiff is a geographical term, and, as such, open and available to any one, and that the plaintiff is not entitled to exclude the defendant from its adoption and use at least in the absence, as here, of any direct evidence of a fraudulent intent on its part to divert business from the plaintiff by deceiving the purchasing public into the belief that defendant's products are those of the plaintiff. After careful consideration of this contention, as applied to the present record, and bearing in mind that this case involves a trade-name, not a trade-mark, and therefor is governed by the law of unfair competition, not that of trade-marks, I reach the conclusion that such contention cannot be sustained. Assuming, for the purposes of this opinion, that the name 'American Products Company' should be regarded as a geographical name indicating products made in America rather than a somewhat fanciful name not intended to denote the place of manufacture of such products, it is well settled that when a person has adopted, as the name of a business, a term geographical, and, by his efforts and expenditures, has developed a reputation and good will for such business

and its products, so that such name has come to mean, in the minds of the general public, that particular business and its products, such name thereby acquires a 'secondary meaning,' as indicating such business, and its owner is entitled to protection, in its use, by a court of equity."

In the case of Furniture Hospital v. Dorfman, 179 Mo. App. 302, 166 S. W. 861, it appears that the plaintiff used the name Furniture Hospital in his business. Thereafter, the defendant, in the same City, and within a quarter of a mile from the store of plaintiff, established a business under the name of New York Furniture Hospital. The defendant was enjoined from using the name, the court stating in part:

"But even descriptive terms may by long use become identified in the minds of the public with the business of a particular trader, and in such case it is unfair competition for a subsequent trader to use them in such manner as to pass off his business for that of the other. * * * In other words, it is not necessary for the subsequent trader to adopt the old, unusual and striking name of the prior trader to describe the goods or business of the former. He can use descriptive terms which will not confuse the public as to the identity of the business carried on. And when this is the case the former name is not unqualifiedly *publici juris* merely because it may be descriptive of the business, but is susceptible of being a non-exclusive trade name with a secondary meaning, that is, a meaning that carries with it the signification that it is the business of a particular owner."

Counsel for the defendant in the case at bar claims that the testimony in this case is insufficient to show that the name of the defendant had acquired a secondary meaning. The testimony tends to show the following facts:

Plaintiff started to use the name Western Ranchman Outfitters in November, 1934, then conducting his business at 312 West 16th Street, in the City of Cheyenne,

Wyoming. The place of business was moved to 210 West 16th Street, in 1941. Defendant's place of business is at 201 West 16th Street, across the street from plaintiff's store, and three doors further East on the corner of 16th Street and Capitol Avenue. Plaintiff has signs on his building prominently showing the trade name adopted by him. The defendant, on July 15, 1943, placed a prominent sign on the East side of his building, some 15 inches in width, reading: "Men's Wear—Western Outfitters (with a symbol of a ranchman or cowboy between these words)—Souvenirs." On the corner of the building is a prominent neon sign, reading "The Hub", and beneath it "Army", and beneath that "Store." On the front of the building, facing 16th Street, is a prominent sign reading "Army Store." The sign on the East side of the building, including the words, "Western Outfitters", is the main sign visible to those coming from the railroad stations in Cheyenne, and, according to some of the testimony, is the sign which attracts special attention. Plaintiff carries for sale men's and women's apparel, and ranch and livestock equipment, harness, saddles, chaps, lariat ropes, bits, spurs, blankets, and practically everything in the way of riding equipment. Defendant carries goods bought by ranchmen and their employees, but these are mostly confined to apparel. Plaintiff, commencing with February, 1935, had catalogs printed showing the goods he carried. Approximately a million were printed since that time which he sent out at the cost of about $75,000. Since the beginning of 1941 alone, 283,000 catalogs were printed at a printing cost of about $20,000. Catalogs were mailed to every recognized and known rancher in the State of Wyoming, Northern Colorado and Western Nebraska, and some catalogs were sent to every state in the United States. Plaintiff also advertised in magazines, erected billboards on highways, offered prizes at all rodeos for

contestants, had 100,000 postal cards printed and mailed throughout Wyoming, made extensive use of the radio at the cost of $48 per month, and in other ways advertised his business,—all in the name of and to make known "Western Ranchman Outfitters." Plaintiff also had made and sold distinctive hats, shirts, jackets, bits and spurs, some or all carrying the trade name of plaintiff, hence, acting as an advertisement to give a distinctive meaning to plaintiff and to his business. Plaintiff also made his store a sort of headquarters for ranchers. 75% of his business is mail-order business, and a good deal of the mail received by plaintiff was addressed to "Western Outfitters", at Cheyenne, with or without the street address, and some of the advertisements of plaintiff refer to Western Outfitters, leaving out the term "Ranchman". Several witnesses testified that plaintiff's name has acquired a significance all its own. Some of them testified to the confusion caused by the defendant's sign, and the Postoffice Department notified plaintiff, after defendant put up his sign, that mail addressed to "Western Outfitters" would not thereafter be delivered, unless it contained a street address. The volume of business, in dollars, done by plaintiff does not appear, but the evidence clearly shows that the volume of the business has been quite large.

The record before us shows that the plaintiff testified that there was a sign on a store across the street from plaintiff, reading "Western Outfitters", and that he had no objection thereto, and that it could not hurt him. Counsel for the plaintiff states that the record contains an error; that the sign was small, about "shoe top level" from the ground, reading "Western Outfits." In view of the fact that the statement in the record is contradictory to the claim of plaintiff, and contrary to the finding of the trial court, we shall accept the explanation of counsel for the plaintiff.

It may be conceded that the name under which plaintiff carries on his business has not become so distinctive as, for instance, the name Denver Dry Goods Company. But he used the name for a long time which, while not conclusive, is evidence of the secondary meaning of the term. Note 150 A. L. R. 1087-1089. His advertising appears to have been much more extensive than that of the ordinary merchants, and could not but have the effect to call the attention of the public to his goods and his business. It is said in Note 150 A. L. R. 1090:

"Nevertheless, the sums spent in advertising, its scope, nature, and duration, all are important factors in determining the existence of a secondary meaning. Large expenditures for advertising tend to establish the acquisition of a secondary meaning. Where the first user's trade arises from copious advertising, the presumption has been held justified that a word so popularized carries the necessary connotation as signifying a single source."

Nims, supra, p. 77, states:

"The facts of each case must be considered in deciding as to the existence of secondary meaning. Long use of a name by one concern creates a strong presumption of the existence of such association. The volume of sales, not in dollars and cents but in the number of articles sold and the amount of advertising of the name, are both important considerations."

It is not always easy to determine whether a conclusion of the trial court is based upon substantial evidence. But after carefully weighing the effect of the evidence in the record, in the light of the rules of law above stated, we have concluded that we are not justified in reversing the trial court on the point here under consideration.

In the cases heretofore cited, the defendant used a name imitating that of the plaintiff and was enjoined from using it. In the case at bar, the sign used by the defendant is, perhaps, more in the nature of an adver-

tisement, and not in the nature of a name used by him. But, of course, whether the terms used by the defendant constitute a name or a mere sign, ought not, it would seem, make any difference in the principle involved, for if deception or confusion would result in either of the cases the result reached should be the same. And so it is said in 52 Am. Jur. 595, that: "It will be considered unfair competition for a proprietor of a business to adopt for his own business a sign or symbol of such apparent imitation of that of a business rival as will likely mislead customers and the public as to the identity of the propietor, the goods sold, or the service rendered. A simulation of the business sign or another which is deceptive and misleading may be enjoined." So it is announced in 63 C. J. 445, that: "The right to the exclusive use of a distinctive name or sign in a particular locality may be acquired. A distinctive name of a place of business will be protected as a trade-name against use or imitation by others. Deceptive signs and names on a place of business or a deceptive dress of a store will be enjoined." Counsel for defendant states that in none of the cases in support of the above text was the erection of the sign or the display of the advertisements the controlling factor. We think that counsel is mistaken in this. In Middlebrook v. Winterscheidt, 118 Kan. 731, 236 P. 825, for instance, the case turned on the use of signs, reading "Golden Rule Store" in the windows of defendant. The defendant was enjoined from using these signs notwithstanding the fact that they only in a small measure were calculated to mislead the public. In New York Life Insurance Co. v. Orpheum Theater and Realty Company, 100 Wash. 573, 171 P. 534, the decision turned on the use of the sign "Orpheum", which the court said was such as to make the public believe that the Orpheum Theater was that of the defendant instead of that of the plaintiff, and the court

said: "This being true, the use of the signs amounted to unfair competition, and the order directing their removal was proper. Wright Restaurant Co. v. Seattle Restaurant Co., 67 Wash. 690, 122 Pac. 348; Martell v. St. Francis Hotel Company, 51 Wash. 375, 98 Pac. 1116, 16 Ann. Cas. 593." The ultimate question is unfair competition, and whether we denominate the means used by the term "name" or "sign" would seem to make no difference.

There is, however, a distinction, as rightly contended by the counsel for the defendant, between the cases cited and the case at bar, in that the sign complained of in the case is only one of several signs used by the defendant, and the only really important question herein revolves round that point. The law appears to be well settled that no man has the absolute right to the use of generic or descriptive terms, even though these terms have acquired a secondary meaning, but that, generally speaking, another has the right to use the same terms in their primary meaning, provided, however, that no confusion results therefrom. 52 Am. Jur. 559; Anno. 150 A. L. R. 1125-1133. And the question herein arises as to whether, particularly, the sign, "Hub Army Store", sufficiently differentiates defendant's business and place from that of the plaintiff. It is a question of fact in each case whether or not the goods or business of the subsequent trader has been so distinguished as to prevent an actual or probable confusion and deception, and all the circumstances in the particular case must be considered. 63 C. J. 408-409. Hence, unless the trial court has drawn an unreasonable conclusion from the evidence in the record, it is our duty to affirm its decision. And it must further be borne in mind that it has been held that the resemblances should be looked at rather than the differences. Proctor and Gamble Company v. Globe Refining Company, 92 Fed. 357, 363. See also Nims, supra, 583-

584; 63 C. J. 484. In the case of Rubber & Celluloid Harness Trimming Company v. F. W. Devoe, et al., 233 Fed. 105, the plaintiff sold goods marked "rubberset". It was held that this had acquired a secondary meaning, and that the defendant had no right to mark his goods "set in rubber", without sufficient distinguishing marks. It was held that to mark them "set in rubber—Devoe", did not distinguish the goods sufficiently. In the case of Barton v. Rex-Oil Co., 29 Fed. 2d 474, the plaintiff used the term "Dye & Shine" on its goods, which had acquired a secondary meaning. The defendant used the term "Dyanshine" on its goods. It further attached a specific notice to its cartons stating that its goods were not manufactured by the plaintiff. The court held on rehearing that an absolute injunction should issue against the use of its term by the defendant, since there was not sufficient means by which the term used by it could be distinguished from the goods of the plaintiff. And Note 150 A. L. R. 1133, states that: "Under the particular circumstances of a case an injunction as absolute in scope as if a technical trademark were involved may issue, if this is the only way to prevent confusion . . .". Counsel for the defendant in this case states that the vital question in this case is as to whether or not the defendant can be prevented from advertising that he has Western outfits for sale. The question is quite easily answered. He cannot be prevented from doing so. But the trouble lies in the manner in which he has done so. The particular combination of the words used by him caused the trouble. He could advertise his goods as effectively in a number of other ways as, for instance, by a sign reading "Sellers of Western Ranchmen's Goods", or "Furnishers of Ranchmen's Goods", or "Ranchmen's Goods for Sale", or "Ranchmen's Goods Sold". But, instead of using one of these simple expedients which would have prevented this law suit, he used a combination of words

almost identical with those used by the plaintiff, and in a sign which stands out distinctly and prominently, close to the plaintiff's store, and at a place where thousands of people going to and from the railroad centers of the City, or coming to the City from the East and South on two of its main roads of travel, can clearly and distinctly see it, and which, according to the testimony of the witnesses, attracts special, and, in fact, the only attention. Looking at the signs of the parties, the court, we think, had a right to find that it is altogether likely that the defendant deliberately copied from the plaintiff, and we cannot say that it was not justified in finding that the only likely purpose was to deceive or at least to cause confusion, and if that was in the mind of the defendant himself, why should not the trial court have the right to find that confusion and deception would result? It is not necessary that instances of actual deception be shown. "It is enough, if in the opinion of the judge, the symbol or device or get-up used by the defendant is one which so closely resembles the symbol, device or get-up by the complainant as to be likely to deceive the public." Rubber & Celluloid Harness Trimming Co. v. Rubber-Bound Brush Company, 81 N. J. Eq. 519, 88 Atl. 210, Anno. Cas. 1915 B 365; Rubber & Celluloid Harness Trimming Co. v. F. W. Devoe, supra; 63 C. J. 396, 52 Am. Jur. 619. And we must bear in mind that the trial court knew that the City of Cheyenne, with its "Frontier Shows" annually attracts thousands of people, many of whom come by train, and whose attention would be called to the sign erected by the defendant, and who, though they might want to deal with the plaintiff, might be induced to think that the store of the defendant is that of the plaintiff. It has been said that the duty is upon the party using the terms complained of in their primary sense, when used by another in a secondary sense, to accompany such use in

the primary sense by some clear and positive statement negativing any connection between them and those having the exclusive right in the secondary signification of the name. Chickering v. Chickering & Sons (C. C. A.) 212 Fed. 490. We cannot, we think, say, as a matter of law, that such clear and positive statement exists in the case at bar. We think that it is a question of fact on which reasonable minds might differ. A merchant may use many terms to advertise his goods, just as the defendant did in this case. When two or more prominent signs are used confusion would naturally result in the minds of men, except those having actual knowledge, to determine under which of the signs the owner means to conduct his business, or whether one or all are meant merely as advertisements. The use of the terms, "Hub Army Store" or "Army Store", are or may be but additions to other names used. Counsel for the defendant says that the defendant conducted his business under the trade name of Hub or Hub Clothing Company, but it does not follow that the public knew that by reason of the signs just mentioned, so as to distinguish his business from that of the plaintiff, and that is the real question in the case. The court has found that the terms just named did not necessarily point out, distinctly at least, that defendant's store was different from that of the plaintiff. The public would not necessarily conclude that plaintiff was using only one term to designate his store or his goods, and might think that the terms just named were used by him in addition to the name used in the catalogs. "The question is specific and concrete. The judge who heard the evidence has answered it." Even so, we might be induced to conclude, under the circumstances, that there would not be sufficient basis for deception, if the business of the parties herein were confined to local trade. But there is an outstanding fact, the importance of which counsel for defendant

has not sufficiently considered or which he has minimized too much. The testimony shows that 75% of the goods sold by the plaintiff is sold through the mail. One check alone, shown in the record, made payable to "Western Outfitters", sent to the plaintiff before the defendant erected the sign of which complaint is made herein, is for the sum of $165.18. Numerous letters in the record were addressed to "Western Outfitters", without any street address. That confusion would, accordingly, result from defendant's sign, is hardly an open question, and what is worse, depending on the attitude of the Postoffice Department, considerable business might be entirely lost, and we think, under the circumstances, mainly to the plaintiff. Taking all the facts into consideration, we are loath to conclude that the trial court erred.

Counsel for the defendant argues that no injunction should have been issued because of the fact that the plaintiff has not shown any damage. That, doubtless, is the requisite in some instances, but the cases seem to be clear that it is not necessary to show actual damages in cases like that before us. Of course, some deception or confusion must result from the acts of a defendant, but actual damages need not be shown. It is said in 43 C. J. S. 440, that: "However, there is an obvious distinction between injury and damage that is not always observed in dealing with the question of injunctive relief, and courts of equity will interpose in a proper case to protect a right, without any reference to the question of actual damage." In 52 Am. Jur. 619, it is stated that it is not "necessary in order to enjoin the unlawful use of a trade-mark or trade name, to show actual damage." A number of cases are cited which sustain the text. A good discussion of the question is found in the case of Bagby & Rivers Co. v. Rivers, 87 Md. 400, 40 Atl. 171, 40 L. R. A. 632, 67 Am. St. Rep. 357. In 63 C. J. 560-561, it is said that an in-

junction would be granted against threatened infringement or unfair competition even in advance of any actual loss. Numerous cases are cited. And see the reasons well stated in Lanahan v. John Kissel & Son, 135 Fed. 899, 903. It must be apparent that in a case such as before us, it would be ordinarily difficult to prove actual damages, and a plaintiff would be substantially remediless, if he could not be protected by an injunction except where actual damages in dollars and cents were shown.

We might add that we do not think that any constitutional question is involved in this case, as counsel for the defendant seems to believe. Persons must so use and enjoy their constitutional rights as not to take any unfair advantage of another. 63 C. J. 469. While the case at bar may be on the borderline, we have concluded after long and careful consideration that we are not justified in reversing the trial court, and the judgment herein, accordingly will be affirmed. It is so ordered.

*Affirmed.*

RINER, J., and KIMBALL, J., concur.