Milton HENDERSON, Appellant
(Plaintiff below),

v.

KIRBY DITCH COMPANY, Alex J. Heinze,
Peter King and Reuben Longwell,
Appellees (Defendants below).

No. 3070.

Supreme Court of Wyoming.

July 24, 1962.

Rehearing Denied Sept. 19, 1962.

Scott & Joffe, Elmer J. Scott, Worland, for appellant.

Gerald A. Stack, Thermopolis, for appellees.

Before BLUME, C. J., and PARKER, HARNSBERGER, and McINTYRE, JJ.

Mr. Justice PARKER delivered the opinion of the court.

Milton Henderson sued the Kirby Ditch Company and its three directors seeking (1) damages because of his not having received his proportionate share of irrigation water at times and at other times having received an oversupply which flooded him; (2) a mandatory injunction requiring defendants to promulgate and enforce reasonable rules and regulations in order to permit plaintiff to secure a steady and uninterrupted flow of his pro rata share of water; and (3) in view of the dispute between the parties as to plaintiff's right to offset damages claimed against unpaid water assessments, a declaration of rights between the parties as to amounts due. The trial court found generally for defendants and entered judgment that plaintiff take nothing but that he be forgiven his 1960 assessment. Plaintiff alleges error on three grounds, that the court viewed the area accompanied only by the president of the ditch company, that a carbon copy of a letter from the superintendent of the local water division to plaintiff was improperly admitted into evidence, and that the findings of the court were against the weight of the evidence and contrary to law.

According to the record, the Kirby Ditch Company is a private corporation [1] organized in 1904 and comprised of about twenty water users who have some 2,800 acres of irrigable land under the ditch, which is about nine miles long. At an annual meeting they set a budget, usually about two dollars per acre ($5,600) with which they do the necessary maintenance work and pay a bookkeeper and half-time ditch rider, who works from April to September at a monthly salary of $225. Plaintiff owns 103 acres irrigable from the Kirby Ditch. His predecessor in title had a right to water which was supplied by the Warm Springs Ditch but in 1940 arranged for a change in point of diversion and contracted with the Kirby

1. Defendants state that the company is in the nature of a co-operative association.

Ditch Company for sixty shares of capital stock under an agreement that he might conduct his water through that ditch. His lands were "to have the same pro-rata right per acre to water conveyed through said ditch in the ratio to other lands under said irrigation ditch." The Kirby Ditch ends at a point some distance from plaintiff's property, and the water is taken from there through the Henderson-Jones Ditch. Henderson purchased the land in 1944 and has been farming it since 1953. According to his testimony the present difficulties began in 1954. The water would be turned in the ditch early, would run over his land at times when it was undesired for irrigating purposes and in the dry season would often be short. He testified that he reported the matter to the water commissioner of the district in 1955 and at that time and frequently during the following years complained to the president and other officers of the Kirby Ditch Company, requested relief, and suggested methods by which the difficulties might be alleviated.

The matter came to a head when Henderson failed to pay his assessments for 1958 and 1959 on the ground that the company did nothing about regulation of the water and in 1960 the company refused his proffered payment of the assessment for that year and cut off his water supply.

The state engineer's office in 1955 recommended notice be served on the users of the ditch, installation of suitable headgates and measuring devices, and the appointment of a Deputy Water Commissioner, apparently a ditch rider, who would operate the system under the direction of the company. Defendants introduced in evidence over the objection of plaintiff a copy of a letter dated July 22, 1958, from Thales Smith, local water division superintendent at that time, stating that in his opinion the undesirable condition could be corrected by the proper use of control structures then in operation, including the spillway structure a short distance above the end of the Kirby Ditch. DeVere Hinkley, superintendent of the local water division from 1959, was called as a witness and stated his views which did not entirely accord with those of his predecessor. He said that in the summer of 1959 he talked to Alex Heinze, President of the Kirby Ditch Company, concerning the matter and that they inspected the ditch. A meeting of the company was called, and he discussed the complaints with the stockholders at considerable length, making recommendations that they cease using the spillway some three-quarters of a mile from the end of the Kirby Ditch (Coal Draw spillway), or at least it be supplemented by one running down a section line, in order to take care of excessive water. He thought such a spillway would cost about $3,000, but defendants introduced testimony, which though quite indefinite tended to show that it might cost as much as $20,000. Hinkley also recommended locking each water user's headgate to the ditch in order to establish better control. The burden of plaintiff's requests was in line with the recommendations of Hinkley, particularly as to the locked headgates. At one time Henderson suggested that he be employed as ditch rider, but the president of the company refused.

Edward Deromedi, employed as ditch rider in 1957, testified that the board told him to use every means to get water to the lower end of the ditch, but he said that he had trouble getting it down there, that he would shut the users on the upper end down one day and they would open it up; he would have to shut them down again; then if someone would turn their water loose the lower end would flood. He said that many of the stockholders did not tell him when they wanted water but would merely take it.

Jack Haines, employed as ditch rider in 1958 and 1959, said that he was "supposed to keep plenty of water in the ditch, and let everybody help themselves. * * * most [patrons] * * * just helped themselves when they wanted water, and when they got through, they'd shut it off. They never said much to me." At another time he said, "Well, I would get a head down to

him [Henderson] and Mrs. Harris, and the next day I come back, it would be gone and there would be headgates open again. I would shut them down and get a head to him two or three days, and they decided they didn't want to irrigate and all shut down, I would have a flood." He said it was the "practice on the ditch for everybody * * to regulate their own headgates and their own checks, and to shut off and turn on when they wanted" and that he had no instructions to the contrary.

The testimony of the company's officers throws some light on the situation. King, the treasurer, insisted that the company had put in control structures which should work but that the reason they did not was the lack of co-operation of the water users. Notwithstanding the fact that locks were recommended in the summer of 1959, when asked why the locks had not been placed on the gates, Heinze responded, "Haven't had time since that order was given to put them in." He also said that such an arrangement would be inefficient as well as expensive, noting two primary difficulties: (1) the cost of ditch riding operations, (2) weeds and dead stock would come down into the headgates and the irrigators would have no way to handle it except to contact the ditch rider. Longwell, vice-president since December 1958, denied that there had been complaints to the ditch board about people manipulating their own checks and headgates. As to locks on the headgates, he said, "We just don't need them." King when asked "whether they had discussed the feasibility of putting locks on the gates" said, " * * * how can you do that, it is impossible. * * * It would take a few years to put in locked headgates, if that is what you want."

An analysis of the record indicates without question that Henderson had experienced difficulties in receiving his proportionate share of the water and had made repeated complaints; that the water users of the Kirby Ditch as a general practice opened and closed their headgates as they desired without consulting the ditch rider;

that the ditch riders found that they could not regulate the water so as to permit the proper proportionate share to go to the lower end without the co-operation of the users, which was not forthcoming; that the state engineer's office had recommended suitable headgates and measuring devices and the appointment of a Deputy Water Commissioner, possibly the ditch rider; and that the members of the board had avoided a real consideration of the subject and made no effort to alleviate the difficulties.

Although the obligation of the parties to this litigation is dependent largely upon the contract previously mentioned by which plaintiff was to receive his proportionate share of the water conveyed by the ditch, the general law on the subject is of considerable interest. 3 Kinney, Irrigation and Water Rights, p. 2672 (2 ed.), quotes, as does 2 Wiel, Water Rights in the Western States, p. 1174 (3 ed.), from Miller v. Imperial Water Company, 156 Cal. 27, 103 P. 227, 229, 24 L.R.A.,N.S., 372, "the stockholder's rights to have water furnished on his land is not based on any special contract entered into by him with the corporation, but is an inseparable adjunct of his membership, and it is a plain duty resting on the corporation in the exercise of its corporate functions to furnish him such water."

In Mountain Supply Ditch Co. v. Lindekugel, 24 Colo.App. 100, 131 P. 789, the court discussed a situation similar to the one at bar except that there the company had a reservoir as well as a ditch system. It was said that the company was charged by law with the duty of exercising reasonable care and diligence in, among other things, making ratable distribution of the water.

In Hyink v. Low Line Irr. Co., 62 Mont. 401, 205 P. 236, it was said that the ditch company had a duty to use reasonable care and diligence in maintaining its canal and keeping it supplied with water and to regulate and divide the use thereof among the several stockholders in accord with their

respective interests.  94 C.J.S. Waters § 353.

We indicated in Laramie Rivers Co. v. Watson, 69 Wyo. 333, 241 P.2d 1080, 1091, that under the statute authorizing maintenance assessments by ditch companies, it was contemplated that the parties subject to assessment would have water available; and in McHale v. Goshen Ditch Co., 49 Wyo. 100, 52 P.2d 678, 681, we pointed out the reciprocal duties of a water user to pay assessments and the ditch company to furnish the water, stating that an injunction might issue to compel a distributor to supply water for irrigation to a consumer in the proper case.

■ Plaintiff's counsel in argument here conceded that the evidence of damage was weak and that accordingly no error was charged on this point.  The failure of proof thus confirmed by this admission disposes of the cause of action which sought recoupment for the loss of crops and likewise of that demanding the damages to be considered as an offset against plaintiff's unpaid assessments.  As to the requested mandatory injunction, even though plaintiff failed to prove damage,[2] he presented substantial evidence to show that there was a serious probability of his being injured if there was no change in the present policy of defendants, and that the officers of the ditch company refused to take any steps for a distribution to plaintiff of his proper share of water, notwithstanding proffered assistance by the state engineer's office. The directors as a minimum should have passed regulations centralizing the control of the use of the water.  This being true the requested mandatory injunction would have been in order except that the plaintiff water user had not fulfilled his part of the contract by payment of his assessments so as to be entitled to injunctive relief under the pronouncement in the McHale case.

Accordingly, we cannot agree with plaintiff's charge that the findings of the court were against the weight of the evidence and contrary to law.

■ Plaintiff's argument that the copy of the water superintendent's letter to Henderson was improperly admitted is without merit in the light of Henderson's admission that he received it.  Moreover, there was no showing that this was prejudicial. Tompkins v. Byrtus, 72 Wyo. 537, 267 P.2d 753, 756;  Trepanier v. Standard Min. & Mill. Co., 58 Wyo. 29, 123 P.2d 378, 380. And see 5A C.J.S. Appeal & Error § 1712, p. 853.

■ Plaintiff maintains that the court improperly inspected premises in company with a defendant and without notice to him or counsel.  Although such inspections are permitted within the proper discretion of the trial court, it is generally assumed that both parties should be notified and given an opportunity to be present.  In Adalex Const. Co. v. Atkins et al., 214 Ala. 53, 106 So. 338, 341, it was said, " * * * it is the wise policy of the law that, in receiving evidence of any kind in judicial proceedings, it should, so far as practical, be done in the presence of the parties, or with opportunity to be present.  We commend this as a rule of judicial propriety in making inspections."  Elston v. McGlauflin, 79 Wash. 355, 140 P. 396, repeated the axiom that a defeated litigant is entitled not only to a fair trial but to the semblance of one. Nevertheless, plaintiff here does not show that the inspection was prejudicial as was his obligation if he is to prevail in the appeal.  Tompkins v. Byrtus, supra; Trepanier v. Standard Min. & Mill. Co., supra.

From a consideration of the entire record, we find no cause to reverse the judgment in this case.

Affirmed.

---

2.  In Bernstein v. Friedman, 62 Wyo. 16, 160 P.2d 227, 234, we explained the distinction between injury and actual damage as concerns injunction cases.  And see 28 Am.Jur. Injunctions § 28;  43 C.J.S. Injunctions § 22, p. 440.