STANDARD OIL COMPANY, a corpo-
ration, Plaintiff,

v.

The STANDARD OIL COMPANY, a cor-
poration, and Sohio Petroleum Com-
pany, a corporation, Defendants.

Civ. No. 3745.

United States District Court.
D. Wyoming.
June 12, 1956.

Wallace H. Martin, Walter J. Halliday and Robert Bonynge (Nims, Martin, Halliday, Whitman & Williamson), New York City, Walter T. Kuhlmey (Kirkland, Fleming, Green, Martin & Ellis), Chicago, Ill., Harry B. Henderson (Henderson & Thomson), Cheyenne, Wyo., and Thomas E. Sunderland, Hunter Johnson, Jr., and L. Bates Lea, Chicago, Ill., of counsel, for plaintiff.

Maurice F. Hanning, Leland L. Chapman, Rufus S. Day, Jr., Robert J. Leaver and Paul C. Shafer, Jr., Cleveland, Ohio, (McAfee, Grossman, Taplin, Hanning, Newcomer & Hazlett), Cleveland, Ohio, Walter H. Free (Campbell, Brumbaugh, Free & Graves), New York City, Carleton A. Lathrop (Lathrop & Lathrop), Cheyenne, Wyo., for defendants.

KENNEDY, District Judge (retired).

This is a trademark infringement case. It seems to be an important piece of litigation for the following reasons: About

thirty-five days were consumed in the taking of evidence and presentation of oral arguments which probably marks it as the longest trial in time consumed which is recorded in the Wyoming Federal Judicial District. Approximately five thousand pages of testimony and arguments make up the written record. In addition to this, however, a considerable number of days were used in the presentation and disposition of advance motions, including a somewhat extended argument of a motion to dismiss on behalf of defendants. By agreement of counsel exchange trial briefs were submitted in advance of oral argument consisting of two briefs for each litigant and covering something over five hundred and fifty pages. Over two thousand exhibits were introduced and received in evidence. Considerably more than one hundred authorities were cited in briefs and arguments, some of which were duplicated by counsel on either side as different conclusions were drawn as to their significance and meaning. The record will show that approximately one hundred and thirty witnesses gave evidence, either orally or by deposition. These witnesses were from long distances from the place of trial, while counsel likewise appeared from remote regions as the above appearances will indicate. The only mystery which remains undisclosed is the expense to the litigants in the preparation and trial of this law suit. This perhaps will only be disclosed when income tax returns reveal the secret and then only for official eyes. These elements all suggest the importance of the litigation, especially to the litigants themselves, and correspondingly place upon the trial court a heavy responsibility in endeavoring to solve the problem involved.

On account of the presiding trial judge having had little experience in the trial of trademark litigation he is perhaps illy equipped to preside over a trial of this character and it was suggested during the trial that it is a case which properly belongs in the bosom of Appellate Courts on account of its complicated questions. Nevertheless, although this Court feels that he may be sitting as a Master to take the evidence, yet under the law the obligation is placed upon him to reach a conclusion to the best of his ability and therefore an honest effort will be made to that end.

The case was filed on May 5, 1954 and the issues are rather sharply drawn and comparatively simple. The gist of the charges laid in the complaint is that the defendant in its use of the word "Sohio" in plaintiff's territory is an infringement of plaintiff's rights and trademarks in that it has caused and will continue to cause confusion in the mind of the public so as to carry with it the idea and significance that it is a Standard Oil company. Plaintiff therefore seeks an injunction restraining the defendant from the use of that word as a trademark in plaintiff's territory, for an accounting and for such other and further relief as may be just, together with costs.

The defendants answer by admitting certain facts alleged by the plaintiff but denying any infringement and assert affirmative defenses of laches and estoppel; that the relief sought by plaintiff would be in the nature of a restraint of trade; lack of equity; abandonment of claim on the part of plaintiff, and a counterclaim seeking a declaratory judgment that the trademarks of defendants do not infringe upon the plaintiff's rights.

In the first instance it would seem that there are certain points which need not be considered as being in dispute and therefore it would not seem necessary to discuss them here and unnecessarily prolong this memorandum: (a) The Courts have decided in a case of this character that the predominating features of a trademark are to be considered from a three-point consideration, which are appearance, sound and meaning. (b) Plaintiff's so-called trademarks which it may use exclusively in its own territory are "Standard Oil", "Standard", "S.O.", "S O Co.", "S O C O" and "Solite"; (c) Plaintiff's territory consists of fifteen states, which are: Colorado, Illinois, Indiana, Iowa, Kansas, Michigan,

Minnesota, Montana, North Dakota, Oklahoma, South Dakota, Wisconsin, Missouri, Nebraska, and Wyoming; (d) Both plaintiff and the defendant The Standard Oil Company of Ohio are so-called integrated companies which in the parlance of the oil industry consist of production, manufacture, transportation and marketing, or distribution, and both the plaintiff and the defendants, with their subsidiaries, are each exercising the aforesaid functions; (e) Each case of this character must stand upon its own facts and circumstances.

Prior to 1911 all the Standard Oil Companies throughout the country were subsidiaries of the Standard Oil Company of New Jersey and at that time under a decree of the Supreme Court of the United States a dissolution was required in order to prevent monopoly and to accomplish free competition in the oil industry. Accordingly, in compliance with that decree the several Standard Oil Companies throughout the country were divorced from the parent company and became so-called independent as to the original company and as to themselves. The territory in which each respectively operated thereupon became its own territory for all purposes and its individual rights as to its use of trademarks and the individual property of each. This fact became known to the general public as Standard Companies acting independently in their own territory in which they had previously operated and entitled to the exclusive use of their claimed and developed trademarks.

In this respect it is probable that the Supreme Court "builded better than it knew" as a distinct rivalry and a decided spirit of competition grew up among them, as with other companies not previously affiliated with the Mother Standard organization. The contest here exemplifies that theory as being a trademark case, it must be on the periphery of company competition. As a result of this realignment in the public mind and through the Press and advertising these companies were variously listed as shown by plaintiff's exhibits from 1924 up to the year 1948, as follows: S. O. New Jersey; S. O. New York; S. O. Kentucky; S. O. Indiana; S. O. Nebraska; S. O. California; S. O. Louisiana; and S. O. Ohio.

Considerable evidence and discussion has arisen over the origin of the name "Sohio". The plaintiff's evidence suggests that its origin is indicated in a publication and exhibit known as "The Sohioan" in 1929 where one of the officials at an O. P. M. A. convention used the following language:

"The Significance of a Name.

" 'Sohio' is of course an abbreviation of the full name of our organization, The Standard Oil Company of Ohio. In a degree which exceeds that which characterizes the trade names of other Standard Oil Companies, such as 'Stanolind', 'Socony', etc., our trade name of 'Sohio' is not far fetched and readily suggests to the average layman the formal name of our organization.

"Furthermore, the ease and familiarity with which the words 'The Standard Oil Company' blend with the word 'Ohio' to form 'Sohio' suggests the long intimacy which has characterized the relations between the Standard Oil Company and the state under whose laws it has been incorporated for almost sixty years.

"It is safe to say that there is scarcely a street, a highway, a public building, or any other public improvement of any sort now existing in this state to whose original cost 'Sohio' has not directly contributed in substantial amounts. After sixty years of service to the citizens of its state, not the least of which has been that of actually helping to build a state, who else could assume to use with such good grace the beautiful name of 'Sohio'."

Defendants' theory is that the name was adopted as their evidence tended to show

at the early date when it came into being was on account of its being euphonic and easily pronounced, with the "S" signifying a superior oil which was manufactured in the state of Ohio by defendants. The evidence further discloses that at the time there was a Superior Oil Company in existence and operated in some of the territory here involved.

While the use of "Sohio" was first confined principally to marketing small parcels and confined largely to the state of Ohio, it did not begin to expand in a major way until some time later. In the late '30's the defendant was operating in the state of Michigan, where this law suit probably had its inception. The products carried by defendant, The Standard Oil Company of Ohio, were sold under the trade names "Fleetwing", "Canfield" and "Boron," but later products were being begun to be sold in the state of Michigan under the name of "Sohio-Fleetwing". This caused the plaintiff to confer with representatives of the defendant companies in an effort to settle their differences as to the use of the name of "Sohio" in plaintiffs' territory, especially in Michigan. While these conferences were proceeding plaintiff through its counsel had made an objection to the name "Sohio" in plaintiff's territory through correspondence. The plaintiff's counsel put the matter up to defendants' counsel through a letter of December 20, 1948, calling the attention to certain cases which it was thought controlled the use of the name "Sohio" and later, in a letter from the General Counsel of the defendant Standard rejected the arguments of plaintiff as to the use of the name in plaintiff's territory and stated that:

"Having gone as far as we have with the use of this name, the Company is determined to continue to use it in the future. It seems to the writer, therefore, advisable to find out as soon as practicable whether your position or the position of our clients is correct."

It is probable that there were other exchanges of communication upon the subject, but it is evident from what has been said by defendants' counsel that it was up to one or the other to make a test which would determine the rights of defendants to use the name "Sohio" in their marketing facilities in the state of Michigan and elsewhere in plaintiff's territory.

While the matter was under further investigation by plaintiff, the defendant companies sold out their holdings in Michigan to the Gulf Oil Corporation, which company proceeded to enter the field and use its own name and trademarks for its operation in that district. This, plaintiff contends, eliminated the necessity of bringing any action to test the point as the use of defendants' trademark name had been eliminated in that particular district where the claim of plaintiff had first originated.

However, some time in 1953 a dealer and distributor in the state of Michigan known as Gibson advertised gasoline at his filling stations under the name of "Sohio". After further protests, to which defendants did not respond, the plaintiff began its investigations for the purpose of contesting the matter in the courts, which resulted in the filing of the case at bar in May 1954, as before stated. In the meantime defendants had continued to enlarge their sale of the Sohio product in other states embraced within the territory of plaintiff, including the state of Wyoming, and has continued such practice up to the present time. The counsel for defendants in other communications indicated that legal problems might be involved in the use of defendants' trademark "Sohio" in plaintiff's territory but that they might be ironed out afterwards.

There is evidence on behalf of plaintiff that various surveys were made in different districts contained in plaintiff's territory which indicated that among casual and ordinary purchasers of gasoline, as well as mere observers of the name, although in the habit of purchas-

ing gasoline at various stations, considered the name "Sohio" stood for a Standard Oil Company and would so regard it. In addition to this, various dealers of the product stated that Sohio was a subsidiary of the company The Standard Oil Company of Ohio. The defendants dispute these surveys as to their efficacy and reliability as competent proofs and also claim that the surveys were not properly conducted, with the additional contention by defendants that under the circumstances they should not be received in evidence as reliable proof of any claim presented by plaintiff. The defendants offered the testimony of a so-called expert that in order to be reliable a survey must be conducted by one who is skilled in the business and the survey organized and directed along well defined lines, such as the "Gallup" system. The plaintiff's survey was conducted by various types of individuals, including college students, who testified, and who did not know the purpose of the survey but simply put to the persons interrogated the question as to what might be their reactions as to the meaning of the word "Sohio". In a substantial percentage of these inquiries, with the survey books introduced in evidence, the inquiries resulted in the persons interrogated stating that they would assume it meant "The Standard Oil Company of Ohio" and other similar responses.

A controversy arose over the use of credit cards issued by the plaintiff in which the names of certain companies were designated for the extension of credit in which certain of plaintiff's affiliates were listed and certain companies other than plaintiff's affiliates were listed but signifying they were not affiliates of the company and included was one of the Sohio Oil companies, although somewhat different in design than that of other companies.

In support of defendants' contention of laches and estoppel on the part of plaintiff, evidence was introduced showing that some of plaintiff's affiliates for a number of years were associated with the Sohio Petroleum Company or its predecessors in developing oil fields in Oklahoma and perhaps elsewhere and that the plaintiff bought and sold oil to the Sohio Company in substantial quantities involving substantially large amounts of money and therefore having knowledge of the existence of the Sohio Company by which the plaintiff becomes guilty of laches and estoppel in the present situation and cannot successfully assert the issue as to infringement on account of the delay in presenting its claim in court. On the other hand plaintiff claims that these dealings were with subsidiaries of plaintiff and these subsidiaries being autonomous in character the matter did not come to the attention of plaintiff's true executives as to any violation of trademark infringement until 1948 when the matter first was presented to the governing officials of plaintiff's company and that any subordinate officials of the plaintiff company were not concerned nor knew anything about the protection of plaintiff's trademarks.

The evidence shows that use by defendants was made of the TV in advertising its wares from points in the state of Ohio in which the word "Sohio" was proclaimed in connection with the name of the defendant The Standard Oil Company of Ohio and the pictures exhibited showed the name "Sohio" in connection with the principal defendant, which was, as counsel designate it, "spilled over" into plaintiff's territory thereby leading to a conclusion that the Sohio was another Standard Oil Company. Another instance is that division orders were issued jointly to the plaintiff and the Sohio Company which should have indicated knowledge of the existence of the Sohio Company operating in states other than Ohio and in plaintiff's territory.

It is rather an unusual circumstance that a considerable number of the witnesses for both parties testified that they did not know of the dissolution decree by the Supreme Court in 1911 and still considered all "Standard Oil" companies as members of one big family.

Another defense submitted by the defendants is that of abandonment where the Socony-Vacuum Company (whose principal retail emblem is the "Flying Red Horse") was operating in plaintiff's territory and was investigated by plaintiff inasmuch as the word "Socony" likewise indicated a Standard Oil Company but upon the investigation in its connection with the other word (now Socony-Mobil Oil), was found not to have created confusion and no proceedings were instituted by plaintiff to prevent its use in plaintiff's territory.

The plaintiff had a number of subsidiaries who operated in several states outside of plaintiff's territory which used certain trademarks like "Pan-Am", "Amoco", "Utoco", etc., but none of these trademarks carried any resemblance to the Standard Company trademarks (except the framework of the sign) and there was also a Stanolind Company which operated outside of plaintiff's territory but its operations were confined to production and manufacturing and carried on no operation in the marketing of products.

No attempt has been made to do anything more than to give a thumbnail sketch of the evidence in order to draw sharp attention to what may be considered as the decisive issues in the law suit. Consideration will now be given to some of the cases which have been cited in an effort to apply the law as it may be pertinent to the facts here presented.

In Avrick v. Rockmont Envelope Co., 10 Cir., 155 F.2d 568, there appeared an infringement suit concerning the use of the trademarks "Sky Mail" and "Sky-Rite". The judgment of the trial court sustaining defendant's motion for summary judgment was reversed. On page 573 appears the following language:

"If, however, as alleged, Rockmont adopted the designation 'Sky Mail' with the intent and for the purpose of colorably imitating Agency's trademark 'Sky-Rite' in order to create confusion and mistake in the public mind, and to deceive purchasers in the belief that its products were those of Agency, such intent is sufficient to justify an inference of confusing similarity."

In Dwinell-Wright Co. v. National Fruit Product Co., 1 Cir., 140 F.2d 618, a trademark case, where at page 623 appears the following language:

"As to the respective goods it is of course important to consider their similarities of appearance and use. But in addition other factors are of equal and in some cases may be of even greater importance. Some of these are whether the goods are ordinarily sold in the same kind of retail stores, as grocery stores or hardware stores, whether they are ordinarily produced by the same manufacturers, whether they have common purchasers, and whether they are ordinarily purchased by the public generally or only by professional buyers, to mention only some of the pertinent consideration. See Am. Law Institute, Restatement of Torts, § 731, et seq."

In the case of Esso, Inc., v. Standard Oil Co., 8 Cir., 98 F.2d 1, known as the Esso case, it appears that the decision was made on one element alone, towit: sound, and on page 5 appears the following language:

"It is urged that the word 'Esso' is not so similar to the trade-marks 'Standard Oil,' 'S O,' and 'S O C O' as to be confusing. It is the accepted rule that similarity of sound, as well as appearance, of the words or letters may constitute infringement. [Cases cited.] 'Esso', when pronounced, is indistinguishable from 'S O'. The initials of the Standard Oil Company are the source from which these marks and brands were derived, and we surmise the value of the brand 'Esso' lies in the fact that it suggests 'Standard Oil.' It has been held in a number of decisions that the name 'Standard Oil Company' is entitled to protection."

Again on page 5:

"It was not necessary to show that any person had been actually deceived by the defendant's use of the trade-names or trade-marks in question and led to purchase its goods on the belief that they were the goods of plaintiff. [Cases cited.] The court, however, found this to be the fact, and this finding is sustained by the evidence. The court found, and the evidence clearly shows, that deception will be the probable result of defendant's act, and this was sufficient to establish a case of unfair competition and of infringement. The law of trade-marks is so closely allied to that of unfair competition that it has often been said to be a part of the common law of unfair competition."

In Hecker-H-O Co., Inc., v. Holland Food Corporation, D.C.N.Y., 31 F.2d 794, it was held that the trademark "H-O" was infringed by the trademark "Hofood". At page 795 appears the following language:

"My conclusion is that plaintiff's trademark 'H-O' is valid, and that plaintiff is entitled to the exclusive use of the same, either with or without the word 'Food' added and attached to the containers of its products."

In Independent Nail & Packing Co. v. Stronghold Screw Products, Inc., 7 Cir., 205 F.2d 921, the use of the word "Stronghold" as an infringement was considered. In the opinion at page 924 the Court quotes from Nims on Unfair Competition and Trade-Marks, as follows:

" 'A corollary to the doctrine that there may be an infringement though only a part of the trade-mark has been appropriated is the rule that " * * * the imitation need only be slight if it attaches to what is salient, * * *." * * * An unfair competitor need not copy the entire mark to accomplish his fraudulent purpose. It is enough if

he takes the one feature which the average buyer is likely to remember.' This court stated the test as follows: 'Whether there is an infringement of a trade-mark does not depend upon the use of identical words, nor on the question as to whether they are so similar that a person looking at one would be deceived into the belief that it was the other; but it is sufficient if one adopts a trade-name or a trade-mark so like another in form, spelling, or sound that one, with a not very definite or clear recollection as to the real trade-mark, is likely to become confused or misled." * * *

"Defendant was the late comer in the adoption of the word 'Stronghold.' Defendant's first use of it was four years after plaintiff had applied it to its new type nail and began its aggressive advertising campaign featuring the word 'Stronghold.' Defendant adopted its logotype emphasizing the word 'Stronghold' with full knowledge of plaintiff's registered trade-mark which featured the same word. It did so at its peril."

In Nebraska Consol. Mills Co. v. Shawnee Milling Co., 10 Cir., 198 F.2d 36, it was held that the term "Mother's Best" and "Mother's Pride" did not constitute infringement. At page 38 the Court quotes from an Oklahoma Supreme Court decision, as follows:

" ' "Under the law of unfair competition, in order to enjoin the use of a trade-name there must be such a similarity to one formerly used or employed that the ordinary buyer, exercising ordinary intelligence and observation in business matters, will certainly or probably be deceived. Mere possibility of deception and confusion is not sufficient." ' "

On page 39 appears also the following language:

"We deem it unnecessary to consider the other grounds on which the trial court based its decision.

The findings set out above are supported by substantial evidence and are not clearly erroneous and those findings alone warrant an affirmance of the judgment below."

In Haller Baking Co. v. Ward Baking Co., D.C.Pa., 293 F. 800, it was held that the trademark "Vitovim" did not infringe the trademark "Vim".

In Quaker Oats Co. v. General Mills, 7 Cir., 134 F.2d 429, the contest concerned the trademarks "Wheaties", "Kornies" and "Maizies" infringing on the plaintiff's use of the words "Oaties" and "Quaker Oaties", in which there was held to be no infringement. This decision seems to have been primarily based on the utter dissimilarity of the names and the dress in which the products were presented to the prospective customers.

■ In Standard Oil Co. of New Mexico, Inc., v. Standard Oil Co. of California, 10 Cir., 56 F.2d 973, it was held that the name of the defendant, Standard Oil Company of New Mexico, was confusingly similar to the plaintiff's name, Standard Oil Company of California, and an injunction granted. At page 978 appears some pertinent language as to the fundamental basis of infringement:

"There was a time in the history of the law of unfair competition when it was a debatable question whether a merchant's good-will indicated by his trade name or trademark extended beyond such goods as he sold (Yale Electric Corp. v. Robertson, 2 Cir., 26 F.2d 972–973), but it is now well settled that the law of unfair competition is not confined to cases of actual market competition. If one fraudulently sells his goods or his services or his securities as those of another, injury may result to the latter although he is not engaged in the manufacture or sale of like goods. Where one passes off his goods, his services, or his business as the goods, services, or business of another, equity will intervene to pro-

tect the good-will and business reputation of the latter from any injury liable to be caused thereby. See cases note 1."

In Household Finance Corp. v. Federal Finance Corp., D.C.Ariz., 105 F. Supp. 164, it was held that under the peculiar circumstances of being used in the same field of activity the use of the symbol "FFC" was an infringement of the symbol "HFC" where the insignia was used in a similarly distinctive manner and enclosed in a circle. In this case it also appears that a confusion had likewise arisen by the one receiving the mail of the other.

In McKinnon & Co. v. HyVis Oils, Inc., 88 F.2d 699, 24 C.C.P.A., Patents, 1105, it was held that the marks "Highpres" and "Hyvis" when applied to lubricating oils were confusingly similar, especially in sound. At page 700 of 88 F.2d appears the following language:

"While it is true that there are three factors to be considered in passing upon similarity of marks, viz., meaning, appearance, and sound, it does not follow that confusion can be found to be likely only where a combination of these factors exist, but sound alone or appearance alone may be sufficient to create likelihood of confusion. Cluett, Peabody & Co., Inc., v. Wright, 46 F.2d 711, 18 C.C.P.A., Patents, 937."

In Bernstein v. Friedman, 62 Wyo. 16, 160 P.2d 227, 228, the Court held that the name "Western Outfitters" infringed the name "Western Ranchman Outfitters", especially where the former is used in connection with the picture of a man wearing ranchman regalia. This case is cited largely for the reason that it is pertinent to the views of the highest court of Wyoming and arose in the same district where the case at bar is being considered.

In Clair v. Kastar, Inc., 2 Cir., 148 F. 2d 644, the following language appears on page 646:

"While a patentee is getting his patent sustained he is not bound to

assert his claims to their fullest scope by suing every conceivable infringer. There is today some reciprocity of duty in this regard; if a manufacturer fears that he will be charged to infringe, he can always inquire of the patentee, and if the answer is unsatisfactory, he can bring an action for a declaratory judgment. The time has now passed when a patentee may sit by and refuse to show his hand. The defendant's putative uncertainties seem to us to have been of its own making."

■ In American Lead Pencil Co. v. L. Gottlieb & Sons, C.C.S.D.N.Y., 181 F. 178, 180, is an opinion written by that outstanding and brilliant jurist of our generation, Learned Hand, where he decides that the phrase "Knoxall" infringes the phrase "Beats-All" and in the opinion adds some remarks which are pertinent in the present situation:

"The second and third objections I shall consider together. I have no difficulty in finding that the phrase 'Knoxall' is an infringement of the phrase 'Beats-All.' There is no such limitation as the defendant puts upon the infringement of a trademark; i. e., that the similarity must go only to the eye or ear. The question cannot be treated in any such technical manner, for always the substantial question is whether the defendant is likely to steal the complainant's trade by the use of the trade-mark in question. I am quite satisfied in this case that there is such similarity between the two phrases as would readily lead in the mind of customers to confusion; a case in point is the infringement of 'Keepclean' by 'Sta-Kleen.' Florence Manufacturing Company v. J. C. Dowd & Co., 2 Cir., 178 F. 73. There are many other decisions in the books which show that it is not alone similarity to the ear or eye which constitutes infringement. In the case of Moore & Co. v. Auwell, 2 Cir., 178 F. 543, the Circuit Court of Appeals held that 'Muresco' was not infringed by 'Murafresco,' Judge Lacombe dissenting upon that point. I interpret that decision as meaning that, as the defendant's name was substantially a description of the article, to wit, mural fresco, the scope of the trade-mark could not extend to prohibiting defendant's use of a descriptive term, else it would itself be bad as a trademark."

In Stamford Foundry Co. v. Thatcher Furnace Co., D.C.N.Y., 200 F. 324, again Learned Hand finds that the phrase "Messmate" infringes "Shipmate" as a trademark in connection with the situation in which it is used, both phrases being used in connection with the use of a stove in the galley of a ship. His language at page 324 is as follows:

"Thereupon dissatisfied with these arrangements, the defendant began to make a ship stove of the same size, of the same appearance, and for the same special use as the complainant's, merely changing the old and perfectly well established trademark, 'Shipmate' to 'Messmate.' Of course, the imitation is not exact; it never is in such cases. The details of the stove have been varied in trifling regards, and the maker's name has been put on the hearth. All that is almost a convention, when you appropriate another man's mark; for there must be some color of good faith, some defense to put forward. Minor differences are supposed to help over hard places. Here the words are quite the same in suggestion, when applied to the galley stove of a ship. Each means that the stove is the crew's companion. It is fatuous to distinguish between the mess and the ship in this connection. In sound, too, though I should not think that essential, the two are quite near enough to confuse. It is impossible to mistake the defendant's purpose, the very ancient desire to trade on another man's name and reputation."

In Standard Oil Co. of Colorado v. Standard Oil Co., 10 Cir., 72 F.2d 524, 525, it appeared that the plaintiff sued to prevent the defendant from using the name of "Standard Oil Company of Colorado" on account of the fact that it tended to create confusion and an injunction was allowed. The case touches upon the question of laches and at page 527 appears the following language:

"Laches cannot be imputed to one who has been justifiably ignorant of the facts creating his cause of action; or, as it is sometimes stated, it is an essential element of laches that the party charged with it should have legal knowledge of the facts creating his cause of action. Note 1.

"Here the plaintiff acted with reasonable promptness after it acquired knowledge of the facts creating its cause of action.

"Furthermore, mere delay is insufficient; it must result in prejudice to the party asserting laches. Note 2.

"The only prejudice alleged is that certain persons purchased stock of defendant because of its name. In our opinion that affords no justification for defendant's continuing its unlawful piracy of plaintiff's corporate and trade names. Requiring defendant to desist will not detract from the inherent value of its stock, and further deceiving of the public will be prevented."

In McLean v. Fleming, 96 U.S. 245, 24 L.Ed. 828, a trademark suit, treats the matter of unreasonable delay. At page 251, of 96 U.S., at page 831 of 24 L.Ed. the language of the Court is as follows:

"Unreasonable delay in bringing a suit is always a serious objection to relief in equity; but cases arise in litigations of the kind before the court where the complainant may be entitled to an injunction to restrain the future use of a trademark, even when it becomes the duty of the court to deny the prayer of the bill of complaint for an account of past gains and profits."

And again at page 258 of 96 U.S., at page 833 of 24 L.Ed. the language of the Court is as follows:

"Acquiescence of long standing is proved in this case, and inexcusable laches in seeking redress, which show beyond all doubt that the complainant was not entitled to an account nor to a decree for gains or profits; but infringement having been proven, showing that the injunction was properly ordered, he is entitled to the costs in the Circuit Court; but the decree for an account and for the supposed gains and profits being erroneous, the respondent, as appellant, is entitled to costs in this court."

In Saxlehner v. Eisner & Mendelson Co., 179 U.S. 19, 21 S.Ct. 7, 45 L.Ed. 60, the Court accepts the ruling in the McLean case in regard to unusual delay.

It will be noted that a comparatively few of the many cases cited have been selected with an effort to determine what the general trend of the courts have been in adjudicating cases of this character. Under the well known formula adopted by the courts that each case must stand upon its own facts and circumstances, it is readily recognized that where these greatly vary, it is difficult to find cases which seem to be sufficiently analogous so as to be of great assistance in the case at bar. Only general principles which have been applied would seem to be relevant in making the decision of the Court and it is therefore doubtful as to any definite aid in guiding this Court's decision although they do reflect in a measure certain guideposts which will be referred to in attempting to arrive at a logical conclusion.

In the "Mother's Best" case the decision is undoubtedly based upon the well recognized doctrine that the word "Mother" can not be restricted for trademark purposes as it is truly generic in the very essence of that term.

The first point to be discussed is the matter of the origin of the name adopted by defendant companies in which the matter of selecting a trademark which may create confusion and mistake in the public mind, as set forth in the Avrick case, supra, and is therefore proper for consideration.

First, in the early days after the dissolution decree of the Supreme Court and beginning at least in 1925 as shown by plaintiff's exhibit above referred to, the different Standard Oil Companies which had become segregated under the decree were generally listed in the public press and in industry advertising as "S. O. New Jersey", "S. O. California", "S. O. Indiana", "S. O. Ohio", and the like and in this respect the term "S. O." through the years had a particular significance in connection with the petroleum industry. When analyzed the term "Sohio" is a corruption of the term "S. O. Ohio" in that it is identical with the original designation of that Standard Oil Company with one "O" eliminated. There may have been an idea that there was a better chance on the single "O" than on the "OO". However, the letters "S. O." are still retained and the word "Ohio" is still retained although they are blended into one word. In the petroleum world the letters "S. O." have always stood for Standard Oil and in turn it is a trademark belonging to the plaintiff and entitled to exclusive use in its own territory.

Second, this theory is substantially confirmed by plaintiff's exhibit above referred to in the statement of one of the officials of the defendants as published in the news sheet "The Sohioan" where he represents the name "Sohio" as being an abbreviation of the name the "Standard Oil Company of Ohio", indicates strongly that this was the real origin of the word. In addition it might be said, that this seems a much more plausible story than that of the defendant to the effect that the "S" represented a superior oil made in Ohio and this in the face of the fact that there was a Superior Oil Company then in existence.

■ Next, as to the question of surveys made by plaintiff, it is true the plaintiff adopted a rather unusual method of conducting its surveys to determine whether or not there might be a confusion in the mind of the purchasing public of petroleum products through the association of the term "Sohio" as indicating a Standard Oil product in plaintiff's territory. The defendants strongly contest not only the efficacy of such a survey but in addition that it should be rejected as proper evidence in the case, principally on account of the fact that it was not conducted along scientific lines or by recognized methods. It would seem that from a review of the authorities some courts have received this as competent testimony and others have rejected it. The Court received this long line of testimony as evidence in the case. We know of no fixed formula which has been generally recognized as a standard for conducting surveys in an attempt to ascertain public opinion. It has been quite generally used in the political field through what is known as the "Gallup" polls and by what is called scientific polling of public opinion. There is no sufficient ground, however, to say that one system of polling in a particular field would be as effective as some other method in a different field. The system used by plaintiff has been severely criticized by a so-called expert on this particular activity. It may be entirely possible that the system adopted by plaintiff in selecting blind interviewers who did not know the purpose of the survey to interview the public in connection with their reactions to what the word "Sohio" meant to them in the oil industry would be as effective as any other method. At least, while not a controlling factor in the matter of the determination of trademark infringement, it is entitled to have a place as evidence in the record.

■ A considerable portion of time in the trial was consumed in discussing the matter of credit cards, which the defendant claimed was a recognition of the defendants' right to the use of the

term "Sohio". Plaintiff's credit cards in general showed a substantial number of companies in which credit cards could be used listing their own affiliates as such and other companies not affiliated, including the Sohio credit card, which was somewhat of a different design than the others although in addition to the Sohio card other unaffiliated companies were likewise listed. The evidence upon this point can not be too highly regarded as a factor in the final decision of the case because in the present era credit cards are so promiscuous they are used extensively on every hand. This Court takes judicial notice of the fact that independent petroleum product retailers advertise that they will recognize credit cards issued by any of the oil companies.

■■ As to the contention of the defendants in their special defense of laches and estoppel, which are connected in their brief and argument in a joint nature, the point has been argued that because of the fact that the plaintiff knew or must have known of the existence of the Sohio Company for a long period of time that they should be estopped in not proceeding earlier to a determination as to the use of the name and likewise guilty of laches for the same reason. The plaintiff contends that the situation was never brought to the attention of its chief executives until some time in 1948 and that its use was with subsidiary companies of plaintiff who never reported to the head office of plaintiff and that in addition these subsidiaries were autonomous in their everyday dealings in the oil industry and had no interest or duty to perform in the matter of protecting the trademarks of the plaintiff. As to these dealings of the subsidiaries of plaintiff with the Sohio Company they were concerned largely in inter-company dealings such as the matter of joint production in oil fields, the buying and selling of petroleum products to and from each other and the recognition of division orders in which both were interested. Whether the evidence is sufficient to show that the plaintiff's chief executives did know or should have known as to the existence of the Sohio Company in connection with these transactions would seem to be immaterial here for the reason that these transactions represented only one function which was indulged in by the plaintiff and its subsidiaries and the defendants and their subsidiaries, that of production or perhaps manufacture, and possibly transportation. These transactions represented no confusion in the matter of marketing or distribution to the public of the products made by the defendants and placed upon their filling stations and stands for sale to the public under its Sohio sign. Therefore it could cause no real alarm to the plaintiff in the sort of transactions which were being indulged because it was only of interest to the oil gentry in general and had no touch with the general public.

Evidently the trouble began in Michigan after the defendants had been operating and selling their products under the names of "Fleetwing", "Canfield" and "Boron". Some time later they began selling a product labeled "Sohio-Fleetwing" in that territory which caused plaintiff to prick up its ears and to call to the attention of the defendants that this was in violation of plaintiff's trademark rights inasmuch as the Sohio term clearly reflected a Standard Oil product. While this matter was being investigated and discussed the defendants sold out to the Gulf Company and that company using its own signs and trademarks, the Sohio sign passed out of the picture in Michigan and the trouble seemed to have been eliminated. Later, however, and about 1953, the Sohio sign again appeared in Michigan in retail activities by a man named Gibson and the trouble broke out anew between plaintiff and defendant counsel, in which plaintiff strongly protested the use of the name in plaintiff's territory. The effort of the defendants to extend their Sohio products into plaintiff's territory was therefore rather persistent and continuous. A considerable exchange of correspondence introduced in evidence illustrates this contest, resulting in the defendants rejecting plaintiff's claim of infringement.

and defendants' counsel stating in the exhibit heretofore referred to, that it was the intention of defendants to use the name until a decision was made to stop them. The defendants made no effort to test the question and proceeded as is proclaimed in the letter to spread its product throughout a large portion of plaintiff's territory and sell the products to the public under the name "Sohio". There is at least one case to the point that it was the duty of the defendants to determine their rights to the use of the Sohio name for their products before proceeding further in their general use. However that may be, the plaintiff immediately proceeded to collect evidence and prepare to contest the right of the defendants to use the name in their marketing facilities in plaintiff's territory, resulting in the filing of this case in May 1954. It is extremely doubtful that the plaintiff would have been able to establish any confusion in the minds of the public in the use of this name in the production or manufacturing areas as in this respect the public would not be interested. Under these circumstances can the plaintiff be charged with a delay which would amount to laches and estoppel in attempting to protect its rights? The question would seem to demand a negative answer for only when the question became paramount in the marketing area was the plaintiff concerned or was the purchasing public brought into the picture. Even if the plaintiff could be charged with delay it would not preclude its securing an injunction where the facts are such as to disclose that under the circumstances, with all the facts known to the defendants, the defendants had by their determined use of a term which was likely to create confusion in the mind of the purchasing public and by the determination of defendants to persist in the use of their trademark in plaintiff's territory, thereby constituting an inherent fraud upon plaintiff and its rights. This is substantiated in the opinion of the Supreme Court in the McLean and Saxlehner cases, supra. As a result the defense of laches and estoppel must be rejected either upon the ground that there was no unusual or unnecessary delay or if there were an unusual delay it would not forfeit plaintiff's right to an injunction.

As to the defense of abandonment interposed by defendants it is largely based upon the fact that the Socony-Vacuum was operating in plaintiff's territory, but after an investigation of the matter plaintiff found that there was no confusion in the minds of the public concerning the use of this name with plaintiff's products and the matter was subsequently amicably adjusted.

The defense of lack of equity appears to be based upon the proposition that the plaintiff is itself operating illegally by its subsidiaries using the same framework of its Standard products in other territories but with names entirely dissimilar to that of Standard, which sign, of course, is used in its own territory. The other signs are such as "Pan-Am", "Amoco", "Utoco", etc. The answer to this is that whatever the form of the sign, oval in shape, with the torch, or simply an oval, these names do not in any way support the theory that these are Standard products, the words being entirely dissimilar in appearance, sound and meaning, if any, and it is the use of the name "Sohio" and in the form of its display, whether in circle or otherwise, that the plaintiff contends constitutes the infringement. Likewise the defendants contend that the use of the word "Stanolind" by plaintiff is more nearly similar to the plaintiff's Standard sign than is "Sohio", but the Stanolind Company deals only in production, manufacture and perhaps transportation and is not engaged in the marketing end of the industry. Therefore it has no direct touch with the public so as to create confusion in the public mind. The defense of lack of equity must therefore be rejected.

As to the defense of restraint of trade little need be said. There is no evidence in the case which indicates that

plaintiff is endeavoring to interfere with the defendant in selling its products in its own territory or that of the plaintiff. The entire evidence indicates and the actions on the part of the plaintiff signify that plaintiff has no objection to the defendants operating in plaintiff's territory if they will eliminate the name on their products which plaintiff claims is an infringement of plaintiff's trademarks, and which the plaintiff has a legitimate right to protect. It therefore cannot be regarded as restraint of trade.

It seems strange that with the plenteous supply of words, letters, signs and insignia of various types one should be selected, as the cited cases illustrate, which is on the borderline of imitating the known trademark of some other dealer in the same type of products. The answer would seem to be that the party selecting such a name intends in some way to share in the good will and the developed market of a dealer in the same class and thereby reap some sort of benefit by deception on the public mind.

It seems to be the rule that in a case of this character a trial judge may reach his own conclusion as to a trademark being of an infringing character on account of appearance, sound and meaning independent of testimony supporting the claim. If this rule be adopted here this judge from his own independent viewpoint will concur in the conclusions reached upon a review of the evidence hereinbefore set forth in that the claimed infringement offends on each of the recognized grounds.

Having reached the foregoing conclusions the concern of the Court is as to its right to grant what might be considered as a limited or "split" injunction. That is to say, can the Court issue an injunction against the defendants limited to the matter of the use of the term "Sohio" in its marketing activities in plaintiff's territory? It would seem to this Court that that sort of an injunction is the reasonable procedure to reach the point here involved. There is no evidence of confusion by use of the word "Sohio" except alone in its marketing operations. The method has at least been adopted in a case in which the Court restricted its injunction to operations in interstate and foreign commerce only. The finding will therefore be that the plaintiff is entitled to an injunction as against the defendants' use of the term "Sohio" in plaintiff's area in its marketing facilities where goods with the sign are sold to the public in filling stations and other marketing operations. The claim of plaintiff for an accounting and damages will be overruled and denied.

The cross-claim of defendants for a declaratory judgment is overruled and denied and the cross-claim dismissed.

It will devolve upon counsel for plaintiff to prepare and submit to the Court findings of fact and conclusions of law, such findings to incorporate such additional factors as are inherent in the case, but in harmony with this memorandum, in collaboration with defendants' counsel if convenient, reserving desired exceptions, together with an appropriate judgment based thereon on or before July 10, 1956, and the clerk will enter an order accordingly.